The STATE OF NEW YORK, The New York State Dept. of Social Services, Cesar A. Perales, as Commissioner of the New York State Dept. of Social Services, The City of New York, The New York City Human Resources Administration, Harvey Robins, as Acting Administrator of the New York City Human Resources Administration, Valerie Rodriguez, individually, on behalf of her children, and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

Richard E. LYNG, as Secretary of Agriculture of the United States, Defendant-Appellee.

No. 773, Docket 86–6261.

United States Court of Appeals, Second Circuit.

Argued Jan. 27, 1987.

Decided Sept. 23, 1987.

Arthur J. Fried, Supervising Atty., Homeless Family Rights Project, The Legal Aid Society, Civ. Div., New York City (Kalman Finkel, Attorney-in-charge; Helaine Barnett, Project Director; Maxwell Gould; The Legal Aid Society, Civ. Div., New York City, of counsel), for plaintiffs-appellants Valerie Rodriguez and the Proposed Class.

Moira Morrissey, Asst. Atty. Gen., State of N.Y. (Robert Abrams, Atty. Gen. of the State of N.Y., Mary Fisher Bernet, Asst. Atty. Gen. of the State of N.Y., of counsel) for state plaintiffs-appellants.

Michael D. Young, Asst. Corp. Counsel of the City of N.Y.; New York City (Michael D. Young, Asst. Corp. Counsel, Frederick A.O. Schwarz, Jr., Corp. Counsel of the City of N.Y., of counsel) on the brief for city plaintiffs-appellants.

Ellen B. Silverman, Asst. U.S. Atty., New York City (Steven E. Obus, Asst. U.S. Atty., Rudolph W. Giuliani, U.S. Atty. for the S.D. of N.Y., of counsel) for defendant-appellee Richard E. Lyng.

Before NEWMAN, CARDAMONE and WINTER, Circuit Judges.

CARDAMONE, Circuit Judge:

The State and City of New York and Valerie Rodriguez, on behalf of herself and her children, (appellants), appeal from an order of the United States District Court for the Southern District of New York (Cannella, J.), denying their motion for a preliminary injunction against the Secretary of Agriculture of the United States, Richard E. Lyng (Secretary). Appellants challenge the Secretary's ruling that the State and City must count an extra public assistance payment—a "restaurant allowance" provided under New York law—as income for the purpose of computing food stamp eligibility. The "restaurant allowance" is paid to those individuals unable to prepare meals at home, primarily the homeless and the disabled, as reimbursement for the extra expenses they incur when purchasing prepared foods. We affirm.

Ms. Rodriguez and her four infant children have been residents of a "welfare" hotel without cooking facilities since August 1985 and are recipients of both food stamps and the restaurant allowance. The effect of the Secretary's ruling is that she and other restaurant allowance recipients lose 30 cents in food stamps for every dollar received under the allowance. Judge Cannella upheld the Secretary's interpretation of the regulations implementing the Food Stamp Act and denied appellants' motion for a preliminary injunction. This decision and our affirmance is not a sign that courts are insensitive to New York's attempt to better the plight of its homeless. But it does suggest that a court may not properly substitute its own notion of what is "fair" economic policy for those living at a poverty level—no matter how strongly those notions are held—where to do so would set aside, as here, the advised actions of the executive and legislative branches of government.

## BACKGROUND

The Food Stamp Act of 1977 provides federal assistance to low-income households in order to help the members of these households obtain a more nutritious diet. Assistance is paid in the form of coupons—or food stamps—used to purchase food. The amount of food stamps a household receives is determined by its size and income as defined by the Food Stamp Act. 7 U.S.C. §§ 2012(o), 2017(a) (1982). For purposes of the Act, it is assumed that a household will use 30 percent of its income to purchase food. The dollar amount of food stamps received by a given household is determined by subtracting 30 percent of the household's income from the assumed monthly cost of providing a nutritious diet for that household.

The United States Department of Agriculture's "Thrifty Food Plan" (Plan) estimates the average food costs of the food stamp family. See 7 U.S.C. § 2012(o) (1982). The Plan assumes that recipients will have sufficient storage, refrigeration, and cooking facilities to prepare food at home. See H.R.Rep. No. 464, 95th Cong., 1st Sess. 207, reprinted in 1977 U.S.Code Cong. & Admin.News 1704, 1978, 2170

(House Report). Food stamps generally cannot be used to purchase "hot foods or hot food products ready for immediate consumption." 7 U.S.C. § 2012(g)(1) (1982). Exceptions are made for meals provided by public or private nonprofit organizations to the disabled, *id.* § 2012(g)(4), and the homeless, 7 U.S.C.A. § 2012(g)(9) (West Supp. 1987), as well as others unable to prepare meals at home. *See, e.g.,* 7 U.S.C. § 2012(g)(8) (1982).

In calculating food stamp allotments normal public assistance grants are generally included as "income" by the Secretary. Some grants are explicitly excluded under exceptions codified at 7 U.S.C. § 2014(d) (1982 & Supp. III 1985). New York State has chosen to supplement regular public assistance payments with a "restaurant allowance" paid directly to those individuals who, either lacking cooking facilities or too disabled to cook, are forced to purchase prepared foods away from home. This allowance is provided as a reimbursement for the additional expense incurred by these individuals. Most eligible individuals receive 71 cents per meal; pregnant women and children receive $1.10 per meal. In 1983, the State of New York sought clarification from the Secretary as to whether the "restaurant allowance" might be excluded from income under subsection 5 of § 2014(d) and its implementing regulations, 7 C.F.R. § 273.9(c)(5). The Secretary advised that the allowance did not qualify as an exception, and that it was includable in the calculation of a recipient's income.

Two years after this ruling, appellants brought the instant action and moved for a preliminary injunction barring the Secretary from including New York State's restaurant allowance as income. The State, City, and individual appellants make two principal arguments. They contend, first, that the Secretary's policy is inconsistent with the Food Stamp Act, its implementing regulations and with the Secretary's own rulings defining income. Second, they assert that the Secretary did not comply with the notice and publication requirements of the Administrative Procedures Act. 5 U.S.C. §§ 552(a)(1), 553 (1982). Before discussing the merits, we examine the scope of our power to review and the rules of deference usually accorded an agency that is interpreting its own regulations.

## DISCUSSION

### I

### Scope of Review and Deference to Agency

■ The initial question to be discussed is our scope of review when a district court denies a motion for a preliminary injunction. Ordinarily, such review is "limited to determining whether the trial court abused its discretion in finding the presence or absence of irreparable harm and a probability that the plaintiffs would succeed on the merits." *Thornburgh v. American College of Obstetricians & Gynecologists,* 476 U.S. 747, 106 S.Ct. 2169, 2176, 90 L.Ed.2d 779 (1986). But, an abuse of discretion standard is not an inflexible rule governing review when the district court's ruling is solely on the law and the facts are not of controlling relevance. When such is the case and with a full record before it, an appellate court need not accord the customary deference to the district court's discretion, but instead may employ its own plenary scope of review. *Id.* 106 S.Ct. at 2177. Because that is the precise circumstance of the instant appeal, that is to say, we have a complete factual record before us, and the question presented relates solely to a question of law, we undertake plenary review of the merits.

To succeed in their challenge, appellants must overcome accumulated judicial wisdom that the Secretary's view in this complex area is more expert than that of the courts. This proposition has been variously expressed as "an agency's construction of its own regulations is entitled to substantial deference." *Lyng v. Payne,* 476 U.S. 926, 106 S.Ct. 2333, 2341–42, 90 L.Ed.2d 921 (1986). Or, the mere existence of "more equitable" alternatives "does not render the Secretary's choice invalid." *Knebel v. Hein,* 429 U.S. 288, 294, 97 S.Ct. 549, 553, 50 L.Ed.2d 485 (1977) (upholding the Secretary's inclusion in income of a

transportation allowance under the 1964 Food Stamp Act). Again, it is not sufficient that appellants show that there are other reasonable ways to construe the statute; rather, they must demonstrate that the Secretary's interpretation is " 'plainly erroneous or inconsistent with the regulation.' " *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945).

As the Court in *Knebel* reiterated: " 'courts should defer to the informed experience and judgment of the agency to whom Congress delegated appropriate authority.' " 429 U.S. at 294 n. 14, 97 S.Ct. at 553 n. 14 (quoting *Mourning v. Family Publications Serv., Inc.,* 411 U.S. 356, 372, 93 S.Ct. 1652, 1662, 36 L.Ed.2d 318 (1973)). Although *Knebel* was decided under the Food Stamp Act of 1964, Pub.L. No. 88–525, 78 Stat. 703, which gave the Secretary more authority to define income than the present Act, *see* House Report, *supra,* at 19, the proposition for which it is cited here remains viable. *See St. Mary's Hosp. of Troy v. Blue Cross & Blue Shield Ass'n,* 788 F.2d 888, 891 (2d Cir.1986). And, as Justice Blackmun observed, concurring individually in *Lukhard v. Reed,* — U.S. ——, 107 S.Ct. 1807, 95 L.Ed.2d 328 (1987), a case involving the definition of income under the Aid to Families with Dependent Children program: "In a statutory area as complicated as this one, the administrative authorities are far more able than this Court to determine congressional intent in the light of experience in the field." *Id.* 107 S.Ct. at 1816 (Blackmun, J., concurring). With these precepts in mind we undertake an analysis of the merits.

## II

### Food Stamp Act and Related Claims

■ The State, City and Mrs. Rodriguez correctly contend that the Food Stamp Act defines "income" broadly to include "all income from whatever source." 7 U.S.C. § 2014(d) (1982 & Supp. III 1985), and that it contains 13 specific and limited categories of payments that are excluded from the calculation of income. *Id.* They urge that the restaurant allowance falls under the fifth exclusion: "reimbursements which do not exceed expenses actually incurred and which do not represent a gain or benefit to the household." 7 U.S.C. § 2014(d)(5). "Gain or benefit" is defined by the regulation implementing this provision as a reimbursement for "normal living expenses." 7 C.F.R. 9(c)(5) (1986).

The Secretary takes the position that the restaurant allowance does represent a gain or benefit to the household. He reasons that the phrase "normal living expenses" refers to broad categories of expenses such as food, shelter, and clothing, subject only to a few limited exceptions not here relevant. He concludes that the restaurant allowance, as a reimbursement for food expenses, is thus a reimbursement for a normal living expense. The Secretary also contends that the restaurant allowance does not satisfy the additional statutory requirement that the reimbursements "do not exceed expenses actually incurred." Our holding that the Secretary has legal authority to define the restaurant allowance as a "normal living expense" precludes the need to rule on his second contention.

More particularly, appellants advance three arguments to support their position that the Secretary's interpretation of the regulations is "plainly erroneous or inconsistent". They claim that it is inconsistent with (A) the wording of the regulations, (B) the legislative history of the Food Stamp Act, and (C) previous determinations of the Secretary. We analyze each of these contentions in turn.

### A. *Wording of the Regulations*

The regulations implementing the reimbursement exclusion explain that

Reimbursements for normal household living expenses such as rent or mortgage, personal clothing, of [sic] food eaten at home are a gain or benefit and, therefore, are not excluded.

7 C.F.R. 273.9(c)(5) (1986). Appellants claim that the phrase "food eaten at home" in this passage creates a presumption that

expenses related to food eaten *away* from home are not "normal." Because New York's restaurant allowance is, by definition, intended to reimburse recipients for the cost of meals prepared away from home, appellants read the regulations as dictating its exclusion. The Secretary acknowledges that the restaurant allowance is awarded primarily to families eating their meals away from home, but he views the phrase "eaten at home" only to acknowledge that *some* reimbursements for food eaten away from home have been explicitly excluded from income. He directs attention to reimbursements for meals eaten at work as one example of this. 7 C.F.R. 273.9(c)(5)(i). But to demonstrate that not all reimbursements for meals eaten away from home are excluded from the calculation of income, the Secretary points to the inclusion of financial aid received by college students for meals eaten at school. *See* 7 C.F.R. 273.-9(c)(5)(iv). Given the ambiguity as to whether the term "food eaten at home", is exclusive, *i.e.*, describes the only food reimbursements that are not excluded from income, we cannot say that the Secretary's reading is "plainly inconsistent" with the text of the regulations.

### B. *Legislative History*

Appellants also contend that the ruling should be overturned because it is inconsistent with Congressional purpose in two respects. First, the Secretary does not define income in a way that reflects a household's ability to purchase food. Second, he fails to read the phrase "normal living expense" in conjunction with the Act's assumptions regarding the "normal" expenses of the average food stamp family. We reject both of these contentions.

### 1. Food Purchasing Power

The first argument rests on two premises: that Congress intended that income should be defined to reflect the food purchasing power of a food stamp household and that the restaurant allowance does not increase this purchasing power in comparison with a household that has cooking facilities. To support the first premise, appellants rely on a passage from the House Report explaining that a deduction for certain work-related expenses was appropriate because a "working household has fewer funds available to buy food after it has incurred [work-related] outlays." House Report, *supra*, at 61. Reliance on this passage for the conclusion that income must be defined in accordance with "food purchasing power" is misplaced. The surrounding language makes clear that Congress only sought to provide "vital work incentives" and "to encourage household members to work by not making it more difficult for a working household ... to purchase its food stamps than a non-working household...." *Id.*

Any broader reading of this passage is contradicted elsewhere in the House Report. That Report indicates that one of Congress' key goals in enacting the Food Stamp Act of 1977 was to overturn cited court decisions that had invalidated the Secretary's rulings—counting certain payments as income—because the court had determined that the payments did not increase a household's food purchasing power. *Id.* at 27–28. By providing more specific definitions of income in the 1977 Act than it had previously, Congress sought to "prevent frequent judicial invalidation of the Department's income regulations and instructions as inconsistent with Congressional goals and/or the even broader judicially-developed interpretation of the Act's purpose as guaranteeing households the right to obtain a nutritionally adequate diet." *Id.* at 19, U.S.Code Cong. & Admin. News 1977, p. 1995.

The House Report then expressly disapproved of the holding in *Hein v. Burns*, 402 F.Supp. 398 (S.D.Iowa 1975) (three judge panel), *rev'd sub nom. Knebel v. Hein*, 429 U.S. 288, 97 S.Ct. 549, 50 L.Ed.2d 485 (1977), which it described as having invalidated the inclusion in income of a reimbursement for training related travel expenses because the reimbursement "did not increase the plaintiff's purchasing power and thus in any way aid plaintiff to attain a nutritionally adequate diet." House Report, *supra*, at 27. The Report

also disapproved of *Turchin v. Butz*, 405 F.Supp. 1263 (D.Minn.1976), which had followed the rationale in Hein in invalidating the inclusion of a similar training allowance. House Report, *supra*, at 28. Commenting upon these cases, the Committee Report could not have been stated more clearly:

> the Committee ... views its broad-gauged definition of income as rational and equitable, since it intends to measure income as broadly [sic] as possible to be fair to all recipients as well as to the taxpaying public *and not simply by reference to purchasing power available for food.*

*Id.* at 27, U.S.Code Cong. & Admin.News 1977, p. 2004 (emphasis added). Thus, Congress has already rejected the first premise of appellants' argument.

The second premise—that the restaurant allowance does not increase a household's food purchasing power—is also plainly not supported by legislative history. Appellants compare restaurant allowance households to households which are able to prepare their meals at home and conclude that the latter has greater food purchasing power even after the former receives the allowance. The Secretary, on the other hand, compares restaurant allowance households to households that are not able to prepare meals at home, but still do not receive the allowance. Appellants' reasoning is similar to that of the lower court in *Hein*, which was rejected by the Supreme Court on appeal:

> The District Court's primary reason for invalidating the regulations was its view that transportation grants do not increase food purchasing power. But the grant does give a household more food purchasing power than another household which receives no grant but incurs similar nondeductible expenses related to training or employment.

429 U.S. at 295–96, 97 S.Ct. at 554. The House Report for the 1977 Food Stamp Act quotes this passage with approval. House Report, *supra*, at 27. Thus, the Secretary's ruling is not, as appellants argue, inconsistent with Congress' aim.

### 2. Normal Living Expenses

As described above, § 273.9(c)(5) of the regulations provides that reimbursements for "normal household living expenses" represent a "gain or benefit" to the household and are therefore not excluded from income under 7 U.S.C. § 2014(d)(5). Appellants' second legislative intent argument is that the phrase "normal living expenses" must be construed in accordance with the assumptions made in the Act about how food stamp recipients normally live. Because the Thrifty Food Plan, in estimating the cost of a nutritious diet and determining the level of food stamps received, assumes that these recipients have the facilities to cook at home, see House Report, *supra*, at 207, appellants conclude that expenses resulting from an inability to cook at home must be considered "non-normal." They contend that the general prohibition against purchasing prepared foods with food stamps, 7 U.S.C. 2012(g)(1), supports this position.

Although this interpretation is not unreasonable, the Act's legislative history does not compel a conclusion that income must be tied to assumptions about how the average food stamp recipient lives. For instance, though the Thrifty Food Plan explicitly "assumes that families ... pay prices similar to those paid by families across the country," House Report, *supra*, at 207, U.S.Code Cong. & Admin.News 1977, p. 2170, the Plan recognizes that some people live in areas with unusually low or high prices. *Id.* Nevertheless, the Act makes no attempt to address this inequity. *See* Subcommittee on Domestic Mktg., Consumer Relations, and Nutrition, Committee on Agriculture, House of Representatives, 99th Cong., 1st Sess., *A Review of the Thrifty Food Plan and Its Use in the Food Stamp Program* 15 (Comm. Print 1985) ("The current system based on national averages is perhaps the only 'fair' method."). Hence, it is clear that Congress chose not to resolve all potential inequities that might arise from its definition of income.

Similarly, while the Thrifty Food Plan also "assumes that families ... buy all

their food and prepare it at home", House Report, *supra,* at 207, U.S.Code Cong. & Admin.News 1977, p. 2170, the Act recognizes that many people cannot do so. *See* 7 U.S.C. § 2012(g)(4) (elderly and disabled persons), (g)(5) (drug and alcohol addicts in treatment facilities), (g)(8) (battered women and children in shelters), and (g)(9) (homeless persons) (codified at 7 U.S.C.A. § 2012(g)(9) (West Supp.1987)). To aid these individuals, Congress exempted them, in part, from the prohibition against purchasing prepared foods with food stamps. *Id.* Congress has therefore demonstrated an awareness of the problems these people face—and has addressed it in one respect. But it has not chosen to amend the definition of income to adjust for their higher cost of living. Consequently, it is not inconsistent for the Secretary to ignore these extra expenses when interpreting the regulations defining income.

### C. *Consistency With Prior Interpretations*

■ Appellants' third argument is that the inclusion of the restaurant allowance in the calculation of income is inconsistent with the exclusion of reimbursements under similar programs. They cite the exclusion of payments under two such programs: emergency shelter payments made to shelter providers on behalf of homeless families and reimbursements paid to households for the expense of temporary housing after a disaster under the Federal Emergency Management Assistance (FEMA) program.

The attempt to analogize the "restaurant allowance" to the "shelter allowance" is unavailing. The shelter allowance is paid directly to the housing provider and is thus excluded from income as a *vendor payment* under subsection 2014(d)(1), rather than as a *direct payment* under (d)(5). Subsection (d)(1) provides for the exclusion from income of *"any gain or benefit* which is not in the form of money payable directly to a household." But subsection (d)(5) only excludes payments which *"do not represent a gain or benefit* to the household." Thus, a comparison between the two allow-

ances is not apt. Consistent with this distinction, the Secretary has regularly advised the State of New York that were its restaurant allowance paid to the vendor directly or in voucher form, it then would be excludable from income.

The attempt to analogize to FEMA reimbursements is also unpersuasive. FEMA grants provide relief only for demonstrated losses and merely attempt to restore recipients to the position they were in before the disaster. FEMA grants therefore confer no "gain or benefit" to the recipient household and are appropriately excluded for income under the food stamp regulations. Although homelessness may be analogized to a natural disaster, we do not believe that the Secretary's choice to treat them differently was unreasonable.

The Secretary's inclusion of the restaurant allowance in income therefore is not "plainly erroneous or inconsistent" with the regulatory scheme.

### III

### Administrative Procedure Act Claim

■ Appellants' second major argument is that the Secretary's application of the regulations to New York's restaurant allowance is void because the Secretary failed to follow the procedures set forth in §§ 3 and 4 of the Administrative Procedure Act, as amended, 5 U.S.C. §§ 552, 553 (1982) (APA). They argue that the Secretary's ruling was promulgated without prior notice and opportunity for comment required by § 4. This argument is unpersuasive because the notice and comment procedures do not apply to "interpretative rules." 5 U.S.C. § 553(b)(A). In distinguishing interpretative rules from substantive rules under § 553, we have held that one "looks to whether a rule 'changed existing rights and obligations.'" *Donovan v. Red Star Marine Servs., Inc.,* 739 F.2d 774, 783 (2d Cir.1984), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1355, 84 L.Ed.2d 377 (1985) (quoting *Lewis-Mota v. Secretary of Labor,* 469 F.2d 478, 482 (2d Cir.1972)). Since there was no prior interpretation of the food stamp regulations concerning any

**354**

program like New York's restaurant allowance, the Secretary's interpretation did not change any "existing rights or obligations." Therefore, this was an interpretative rule not subject to the notice and comment requirements of § 553.

Another argument advanced here is that the regulations are void because the Secretary failed to publish them in the Federal Register in accordance with § 3 of the APA, as amended, 5 U.S.C. § 552 (1982). This section requires that "[e]ach agency shall ... currently publish in the Federal Register for the guidance of the public ... interpretations of general applicability formulated and adopted by the agency." 5 U.S.C. § 552(a)(1)(D). Concededly, there has been some uncertainty about how to define "interpretations of general applicability", *see* 1 K. Davis, *Administrative Law Treatise* § 5:11 (2d ed. 1978). We think the reading of this phrase by the Sixth Circuit in *Hogg v. United States*, 428 F.2d 274 (6th Cir.1970), *cert. denied*, 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 805 (1971), is sound. In that case the court stated that "the requirement for publication attaches only to matters which if not published would adversely affect a member of the public." *Id.* at 280. *Accord, Cubanski v. Heckler*, 781 F.2d 1421, 1428-29 (9th Cir.1986), *cert. granted sub nom. Bowen v. Kizer*, —— U.S. ——, 107 S.Ct. 1282, 94 L.Ed.2d 141 (1987); *Donovan v. Wollaston Alloys, Inc.*, 695 F.2d 1, 9 (1st Cir.1982); *United States v. Fitch Oil Co.*, 676 F.2d 673, 678 (Temp.Emer.Ct.App. 1982); *United States v. Goodman*, 605 F.2d 870, 887-88 (5th Cir.1979). *See also United States v. Hayes*, 325 F.2d 307, 309 (4th Cir.1963) (per curiam) (decided under predecessor to § 552(a)). *But see Anderson v. Butz*, 550 F.2d 459, 463 (9th Cir.1977) (an interpretation of general applicability is one that does more than clarify or explain existing law or one that has a significant impact upon a segment of the public).

We adopt this reading of the statute because it comports with the stated purpose of providing guidance to the public, *see* § 552(a)(1), and reconciles the broad language of this provision with the impracticability of publishing all interpretative rulings. *See generally* 1 K. Davis, *supra*, § 5:11, at 345-47. Because the food stamp program is administered by the State and City of New York, which are, of course, aware of the ruling, and because no argument has been presented that any recipient might be adversely affected by its non-publication, the ruling does not come within the publication requirement of § 552.

## CONCLUSION

The Secretary's determination that the restaurant allowance is includable in the calculation of income under § 2014 was not plainly erroneous, nor was the ruling rendered invalid by a failure to comply with the APA. The district court's denial of appellants' motion for preliminary injunction therefore is affirmed.

Order affirmed.