Debra J. ESTEY, et. al., Plaintiffs,

v.

COMMISSIONER, MAINE DEPARTMENT OF HUMAN SERVICES, Defendant,

and

Edward Madigan, in his official capacity as Secretary, U.S. Department of Agriculture, Defendant–Intervenor.

Civ. No. 92–67–B.

United States District Court, D. Maine.

Feb. 17, 1993.

Marina E. Thibeau, Asst. Atty. Gen., Augusta, ME, for defendant Com'r, Maine Dept. of Human Services.

Frank D'Alessandro, Pine Tree Legal Assistance, Presque Isle, ME, for plaintiffs.

## ORDER AND MEMORANDUM OF OPINION

BRODY, District Judge.

This matter is before the Court on Cross-Motions for Judgment on a Stipulated Record. At issue is whether Defendants violated the Food Stamp Act of 1977, as amended, 7 U.S.C. § 2011 *et seq.*, by including Housing and Urban Development ("HUD") and Farmers Home Administration ("FmHA") utility reimbursements received by Plaintiffs as income when calculating Plaintiffs' food stamp benefits. Specifically, Plaintiffs allege that the reimbursements they receive qualify as "energy assistance" and should therefore be excluded from the food stamp income calculation pursuant to 7 U.S.C. § 2014(d)(11). Because the Court finds that HUD and FmHA utility reimbursements do not qualify as "energy assistance," Defendants' policy of crediting such payments toward income in food stamp determinations does not violate the Food Stamp Act. Therefore, judgment on the stipulated record is *GRANTED* for Defendants.

## I. BACKGROUND

### A. *Procedural and Factual History*

The named plaintiffs in this class action suit are Debra Estey and Felix St. Peter. Plaintiff Estey lives in housing owned by a private individual and funded in part by loans from the FmHA, a component agency of the Department of Agriculture. Plaintiff St. Peter lives in a privately owned housing unit participating in the HUD Section 8 Housing Assistance Program. 42 U.S.C. § 1437f.

Plaintiff Estey filed an Amended Class Action Complaint against the Commissioner of the Maine Department of Human Services in Maine Superior Court on or about October 9, 1991. Defendant Commissioner of the Maine Department of Human Services is responsible for administering the food stamp

Nancy Torresen, Asst. U.S. Atty., Bangor, ME, Peter D. Coffman, Dept. of Justice, Federal Programs Branch, Washington, DC, for defendant-intervenor Madigan.

program in compliance with federal laws and regulations. Edward Madigan, then Secretary of the United States Department of Agriculture, filed a Motion to Intervene which was granted on March 11, 1992. As Secretary, Defendant–Intervenor Madigan was responsible for establishing guidelines for the administration of the food stamp program and developed the policy now under review. Madigan removed the case to this Court on April 16, 1992.

As presently constituted, Plaintiffs' Complaint asserts claims for relief under 42 U.S.C. § 1983, 5 M.R.S.A. §§ 11001–11007, and 5 U.S.C. § 706.

On July 1, 1992, the Court granted Plaintiffs' Motion for Class Certification. The certified class consists of the following:

> All the persons in the State of Maine who will receive or who have received FmHA and/or HUD utility allowance payments anytime since March 1, 1990 and whose food stamp benefits were or will be wrongfully terminated, reduced, or denied because of the defendant's policy of refusing to exclude FmHA and/or HUD utility allowance payments from "income" when determining food stamp eligibility and benefits.

See Pls.Mot.Class Certification, May 22, 1992.

Both Plaintiff and Defendant–Intervenor Madigan filed Motions for Summary Judgment on November 13, 1992. Defendant Commissioner of the Maine Department of Human Services joined in Madigan's Motion. On December 28, 1992, the parties agreed to convert their Cross–Motions for Summary Judgment to Cross–Motions for Judgment on a Stipulated Record.

### B.  The Food Stamp Act

The food stamp program was developed by Congress in 1964. Its mission is "to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011 (1988). The Act establishes a federally-funded, state-administered program to supplement the purchasing power of low-income households.

Susan v. Scales, Civ. No. S91–65M, slip op. at 2 (N.D.Ind. May 18, 1992). The food stamp program is a "needs based" program. Eligible households receive an allotment of coupons that may be used exclusively to purchase food from retail stores. 7 U.S.C. § 2013. Eligibility and benefits are determined by calculating the income resources available to a household and comparing those resources to a national standard developed for the program by the Department of Agriculture. 7 U.S.C. § 2014. The lower the income, the greater the benefits awarded under the program.

The Food Stamp Act presently defines household income to include "all income from whatever source." 7 U.S.C. § 2014(d). Sixteen specific exclusions and several deductions, however, are set forth in the Act. 7 U.S.C. § 2014(d) and (e). The exception at issue here excludes from the income calculation "any payments or allowances made for the purpose of providing energy assistance (A) under any Federal law, or (B) under any State or local laws designated by the State or local body authorizing such payments or allowances as energy assistance...." 7 U.S.C. § 2014(d)(11).

Participating states administer the food stamp program pursuant to federal guidelines set forth in 7 U.S.C. § 2020. Under the program, final determinations on eligibility and the amount of food stamps issued are made by the states pursuant to regulations set forth by the Secretary of Agriculture. The federal government pays up to 50% of the states' administrative costs. 7 U.S.C. § 2025(a). The State of Maine has elected to participate in the program under 22 M.R.S.A. § 3104.

### C.  HUD and FmHA Public Housing Assistance

Plaintiffs are the recipients of HUD and/or FmHA housing assistance. Because the relevant features of the two housing assistance programs are similar, they are addressed in tandem.

Publicly assisted housing under HUD and FmHA can be either privately or publicly owned. Each individual unit is assigned an "approved shelter cost." The approved shel-

ter cost represents the basic rent for the unit plus a "utility allowance" to help defray utility costs. 24 C.F.R. §§ 813.107, 813.102, 965.-470; 7 C.F.R. Pt. 1930, Subpt. C, Exh. E–II. The utility allowance is based on a community-wide standard, not on actual individual consumption.

As recipients of HUD or FmHA housing subsidies, Plaintiffs pay rent totaling thirty percent of their adjusted household income. This rental payment is called the "monthly tenant contribution" or "total tenant payment." While the tenant contribution is payable toward the approved shelter cost, it may be offset by the utility allowance.

The FmHA utility allowance considers expenses such as heating, air conditioning, cooking, electrical lighting, refrigeration, water heating, water and sewer services, and trash collection. 7 C.F.R. Pt. 1944, Subpt. E, Exh. A–5. The HUD utility allowance covers electricity, gas, heating fuel, water and sewer services, and trash and garbage collection. 24 C.F.R. § 965.472. Because the utility allowance is based on an approximation of a tenant's utility expenses, the tenant's actual utility costs may be less than or exceed the utility allowance.

The owner of the housing unit may meter the units as a whole and pay the utilities, or meter the units individually and have the tenants pay the utility companies directly. In both instances, the utility allowance is payable to the owner.

When utilities are individually metered and paid for by the tenant, the owner credits the utility allowance against the tenant's monthly contribution. Usually, the tenant contribution exceeds the utility allowance. When this happens, the owner credits the utility allowance against the tenant contribution and the tenant pays only the difference. 7 C.F.R. Part 1930, Subpart C, Exhibit E–II.E. When the tenant's adjusted household income is very low, the tenant contribution (thirty percent of the adjusted income) is very small. In this event, the utility allowance may exceed the tenant contribution. When the utility allowance exceeds the tenant contribution, the owner must remit to the tenant the amount by which the utility allowance exceeds the tenant contribution. This

is called a "utility reimbursement" and it may be used in whatever way the tenant deems appropriate. There is no requirement that it be spent for utilities. *Mitchell v. Block*, Civ. No. 82–3297–3, slip op. at 6–7 (D.S.C. June 22, 1982).

The Secretary of Agriculture generally excludes utility allowances from household income when making food stamp eligibility or benefit determinations. Utility allowances are excluded from income when utility expenses are initially paid by the owner. They are also excluded when utilities are paid directly by residents whose tenant contributions exceed the utility allowance. The Secretary does not, however, exclude from income utility reimbursements that are paid to individually metered tenants whose utility allowance exceeds their tenant contribution. The Secretary's inclusion of utility reimbursements in food stamp income calculations has lowered Plaintiffs' food stamp benefits.

## II. DISCUSSION

### A. *The Chevron Test*

Plaintiffs assert that utility reimbursements should be excluded from income in calculating food stamp allotments. They argue that utility reimbursements fall within the definition of "energy assistance" and should, therefore, be excluded from income under the Food Stamp Act.

As set forth above, § 2014(d) of the Food Stamp Act states that "[h]ousehold income for purposes of the food stamp program shall include all income from whatever source." A number of specific exceptions are included. Section 2014(d)(11) excludes, in relevant part, "any payments or allowances made for the purpose of providing energy assistance (A) under any Federal law...."

The Supreme Court in *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), set forth a two-step approach for reviewing an administering agency's construction of a statute. *Chevron* states:

> When a court reviews an agency's construction of the statute which it adminis-

ters, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. *Id.* at 842–843, 104 S.Ct. at 2781–2782.

#### 1. The Statutory Language

■ The language of the statute is the starting point for all statutory interpretation. *United States v. James,* 478 U.S. 597, 604, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986). "If the statute is plain and unambiguous, the court's duty is to give effect to the terms and go no further." *Larry,* 753 F.Supp. at 791–92.

Section 2014(d)(11) provides an income exclusion for payments or allowances made for "energy assistance." This clearly limits the exclusion to energy costs as opposed to nonenergy costs. Plaintiffs seek to either equate the terms "energy" and "utility" or have utility reimbursements defined within the meaning of "energy assistance." Both HUD and FmHA, however, include such nonenergy activities as trash collection, water, and sewerage services in their definition of "utilities." Thus, the statute's language is ambiguous in the context of this case and subject to further analysis.

"While the statutory language clearly distinguishes between energy and nonenergy payments, it unfortunately does not define 'energy assistance,' and that phrase is subject to two conflicting interpretations." *Larry v. Yamauchi,* 753 F.Supp. 784, 793 (E.D.Ark.1990). Plaintiffs argue that the phrase should be broadly interpreted to include any general allowance for energy use, including HUD and FmHA utility reimbursements. Defendants counter that the exclusion was intended solely to offset dramatic increases or "spikes" in home energy costs. Because the issue turns on the meaning of the statutorily ambiguous phrase "energy assistance," it is necessary to examine the energy assistance exclusion's legislative background.

#### 2. The Legislative History

Prior to 1977, the Food Stamp Act did not define "income" in relation to food stamp eligibility or benefit determinations. Citing considerable confusion, Congress amended the Act in 1977 to define income as "all income from whatever source." *See* H.R.Rep. No. 464, 95th Cong., 1st Sess. 24, *reprinted in* 1977 U.S.C.C.A.N. 1704, 2001. A limited number of exceptions were provided. At the time, Congress clearly signalled its desire to define income as broadly as possible:

> The Committee chose to rely on a combination of this terminology—"all income from whatever source derived." The Committee's intent in employing that term by reference is to cast the broadest possible net, including all forms of what has been found to constitute income.

*Id.*

The energy crisis of the late 1970's prompted Congress to enact programs to combat the debilitating effects that sharply higher energy costs were having on fixed-income families. These sharp price hikes led Congress to consider an additional exclusion in calculating income for food stamp benefits.

> In the fall of 1979, the question of exclusion arose in connection with the Federal Government's efforts to offset low-income households' increased home energy costs through a range of intervention.... Since the idea of these new programs was essentially to hold low-income households harmless by permitting them to buy the same amount of energy they would have utilized in past years without having to diminish their already marginal incomes, the programs represented more of a wash transaction than any real increase in the recipi-

ent or benefitted household's purchasing power.

H.R.Rep. No. 788, 96th Cong., 2d Sess. 121, *reprinted in* 1980 U.S.C.C.A.N. 843, 954–55. "While the new programs contained provisions excluding the energy assistance payments as income ... the House Committee on Agriculture 'prefer[red]' that amendments to the Food Stamp Act be made under its aegis,' and therefore decided to 'incorporate the essence,' of these existing exclusions into an eleventh exclusion...." *Larry,* 753 F.Supp. at 795–96 (quoting H.R.Rep. No. 788 at 122, *reprinted in* 1980 U.S.C.C.A.N. at 955). Congress amended the Food Stamp Act in 1980 to create the original § 2014(d)(11) energy assistance exclusion.

The original energy assistance income exclusion encompassed "any payments or allowances made under any Federal, State, or local laws for the purpose of providing energy assistance." Food Stamp Act Amendments of 1980, Pub.L. No. 96–249, § 102, 94 Stat. 357 (1980) *quoted in Larry,* 753 F.Supp. at 796. The Committee Report noted that "[o]nly where energy costs are a but-for cause of the increased payment should the payment be excluded from income, and, then, only to the extent that the increase is attributable to high heating costs rather than general inflationary conditions." H.R.Rep. No. 788 at 123, *reprinted in* 1980 U.S.C.C.A.N. at 956.

Based on these excerpts from the Committee Report, it is clear that Congress' intent in 1980 was to exclude only those payments that focused on the problem of energy assistance within the context of spiraling energy costs. *Larry,* 753 F.Supp. at 796. "Congress intended the energy assistance exclusion to relieve low-income households of the grisly choice 'between heating or eating' when energy cost spikes outstrip these households' limited means." *Maryland Dept. of Human Resources v. United States Dept of Agriculture,* 976 F.2d 1462 (4th Cir.1992) (citing

H.R.Rep. 106, 97th Cong., 1st Sess. 257 (1981)). Rapid fluctuations, rather than standard inflationary pressures, were the driving concern of the exclusion.

In 1980, the Secretary of Agriculture implemented the new exclusion without applying it to HUD or FmHA utility reimbursements. Congress did not review or criticize the Secretary's decision when it amended § 2014(d)(11) in 1981. The 1981 amendment created § 2014(d)(11)(B) to prevent states from using loopholes to improperly shift their welfare burden to the federal government.

In 1988, Congress amended the energy assistance exclusion through the Hunger Prevention Act of 1988, Pub.L. No. 100–435, 102 Stat. 1645 (1988).[1] This amendment was designed to clarify that the Department of Agriculture and local agencies do not need to conduct an inquiry into the purpose of a federal statute before excluding energy assistance payments. "The crucial question should be whether the purpose of the payment is energy assistance, not whether the statute, as a whole, is primarily for energy assistance or includes other human services as well." S.Rep. No. 397, 100th Cong., 2d Sess. 29, *reprinted in* 1988 U.S.C.C.A.N. 2239, 2267. The Committee Report emphasizes that this was meant as a "technical correction" and was "not intended to change current policy." *Id.* at 28–29, 1988 U.S.C.C.A.N. at 2266, 2267.

Plaintiffs rely heavily on *West v. Bowen,* 879 F.2d 1122 (3d Cir.1989), to support their position on the exclusion. This reliance is misplaced. *West* reversed a lower court's holding in support of the Secretary's policy on utility reimbursements. The lower court, however, based its support of the policy on the outdated "purpose of the statute" approach instead of the "purpose of the payment" approach favored by the 1988 amendment. *West* held, in light of the 1988 amend-

---

1. Prior to the 1988 amendment, § 2014(d)(11) excluded "any payments or allowances made under (A) any Federal law for the purpose of providing energy assistance, or (B) any State or local laws for the purpose of providing energy assistance...."

The 1988 amendment changed the exclusion to read "any payments or allowances made for the purpose of providing energy assistance (A) under any Federal law, or (B) under any State or local laws designated by the State or local legislative body authorizing such payments or allowances...."

ment, that the district court had erred in looking only at the purpose of the statute.

While technically correct on the narrow issue it considered, the Third Circuit did not address the larger question of whether utility reimbursements fall within the definition of 'energy assistance.' *Larry*, 753 F.Supp. at 799. This is evidenced by *West's* central holding which states "[g]iven Congress' clearly expressed intention, we are satisfied that all payments for energy assistance should be exempted from income when determining eligibility for food stamps." *West*, 879 F.2d at 1132. This holding does nothing more than frame the issue by restating the § 2014(d)(11) energy assistance exclusion.

In 1988, as in 1981, Congress did not criticize or review the Secretary's decision not to apply the energy assistance exclusion to HUD and FmHA utility reimbursements. The lack of Congressional action against the Secretary's interpretation of the income exclusion is significant. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard, Div. of Loew's Theatres, Inc. v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978). Referring to an agency's longstanding statutory interpretation, the Supreme Court held in *N.L.R.B. v. Bell Aerospace Co.* that "congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–62, 40 L.Ed.2d 134 (1974), *overruled on other grounds, N.L.R.B. v. Hendricks Cty. Rural Electric Corp.*, 454 U.S. 170, 102 S.Ct. 216, 70 L.Ed.2d 323 (1981).

█ *Chevron* holds that where the legislative history of a statute is reviewed, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." 467 U.S. at 837, 104 S.Ct. at 2778. "The ultimate question if the statute is silent or ambiguous is whether the agency's interpretation is 'rational and consistent with the statute.'" *Maryland Dept. of Human Resources*, 976 F.2d at 1470 (quoting *Sullivan v. Everhart*, 494 U.S. 83, 89, 110 S.Ct. 960, 964, 108 L.Ed.2d 72 (1990)). "[I]t is not sufficient that appellants show that there are other reasonable ways to construe the statute; rather, they must demonstrate that the Secretary's interpretation is 'plainly erroneous or inconsistent with the regulation.'" *New York v. Lyng*, 829 F.2d 346, 350 (2d Cir.1987) (quoting *United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977)). "Deference is especially 'appropriate' when a statute such as the Food Stamp Act 'has produced a complex and highly technical regulatory program' requiring numerous 'policy determinations' within the expertise of the agency." *Maryland Dept. of Human Resources*, 976 F.2d at 1470 (quoting *Pauley v. BethEnergy Mines, Inc.*, — U.S. —, —, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991)).

█ After reviewing § 2014(d)(11)(A)'s legislative history, and granting the appropriate deference to the agency's statutory interpretation, this Court concludes that HUD and FmHA utility reimbursements do not fall within the ambit of the "energy assistance" exclusion to the Food Stamp Act. The energy assistance exclusion was created to offset surging energy prices. HUD and FmHA utility reimbursements do not fall closely enough within the ambit of energy assistance to qualify for the exclusion. Utility reimbursements are akin to general welfare payments, adjusted on a yearly level to keep up with more broad-based inflationary pressures. As routine payments, they are not excludable from income for food stamp purposes.

## III. CONCLUSION

Deference to the Secretary's reasonable interpretation of the statute dictates that Defendants prevail.[2] Plaintiffs' claims for relief under 42 U.S.C. § 1983, 5 M.R.S.A. §§ 11001–11007, and 5 U.S.C. § 706 fail un-

---

**2.** Plaintiffs suggest an alternative notion that energy costs could be segregated from nonenergy costs, thus allowing for partial income exclusion within the context of the utility reimbursement.

Because the Court believes that the Secretary's interpretation of the statute is reasonable, it will not impose upon the Secretary the additional administrative burdens advanced by Plaintiffs.

der the test set forth in *Chevron.* Accordingly, judgment on the stipulated record is *GRANTED* for Defendants.

SO ORDERED.