Jia–Ging DONG, a/k/a Jia Qing Dong, Petitioner,

v.

William SLATTERY, District Director of the United States Immigration and Naturalization Service, New York District, L. Milhollen, Director of the Executive Office for Immigration Review and Chairman of the Board of Immigration Appeals, Respondents.

No. 93 Civ. 8973 (MBM).

United States District Court, S.D. New York.

Nov. 23, 1994.

Theodore N. Cox, New York City, for petitioner.

Mary Jo White, U.S. Atty., S.D.N.Y., F. James Loprest, Asst. U.S. Atty., New York City, for respondents.

## OPINION AND ORDER

MUKASEY, District Judge.

Petitioner Jia–Ging Dong petitions for habeas corpus relief from a Board of Immigration Appeals ("BIA") decision denying him political asylum. He argues that a prior decision on which the BIA relied is no longer good law, and is otherwise inapplicable. For the reasons set forth below, the Order is affirmed and the petition is dismissed.

### I.

Dong, a thirty-year old citizen of the People's Republic of China ("PRC"), was one of approximately 300 PRC nationals aboard the vessel Golden Venture when it ran aground on a beach in New York on June 6, 1993. (R. 183–84, 190) After Dong swam to shore, the Immigration and Naturalization Service ("INS") detained Dong and charged him with attempting to enter the United States without valid entry documents. (R. 154–55, 171) The INS then transferred Dong to an INS detention facility in New York City and instituted exclusion proceedings under the Immigration and Nationality Act of 1952 (the "Immigration Act"), 8 U.S.C. §§ 1182, 1226. (R. 192)

At a hearing before an Immigration Judge ("IJ") on August 18, 1993, Dong testified to the following circumstances that led him to flee the PRC. Dong and his wife lived in the Lian Giang county in the Fujian Province of the PRC. (R. 60) They had their first child, a son, in 1986. (R. 62) Because their son suffered from polio, PRC family planning officials permitted them to have a second child, an exception to the general rule in the PRC that a family may have only one child. (R. 63, 144) They had a healthy daughter in March 1988. (R. 63) In July 1988, the "chairwoman" of the local family planning committee came to Dong's home and "order[ed] his wife to have an IUD inserted." (R. 65) Dong and his wife decided to comply because an IUD would have been inserted "by force anyway." (R. 65)

Dong's wife nevertheless became pregnant with a third child in November 1992. (R. 66) After learning of the pregnancy, the chairwoman for local family planning visited the Dongs again in February 1993 and ordered Dong's wife to have an abortion. (R. 66) She warned Dong's wife that if she fled to avoid the abortion her house would be destroyed. (R. 66) Several days later Dong and his wife fled to her sister's home in another village, where they planned to hide until she gave birth. (R. 67) Shortly thereafter, Dong's father, with whom they had lived, visited them in hiding and told them that he had been beaten by the authorities, and that some of the contents of their home had been destroyed, including the door to their home, the kitchen stove, and some cabinets. (R. 68–69) Dong's father further recounted that the authorities said that if they caught Dong and his wife, they would "beat [Dong] up" and "seize [his] wife for abortion." (R. 68) At that time, Dong decided to flee the PRC. (R. 69)

On March 3, 1993, Dong boarded the Golden Venture for the United States. (R. 69) He later learned from his father that the authorities had seized his wife when she was four and one-half months pregnant and forced her to undergo an abortion. (R. 69–70) She experienced some complications, which required hospitalization, but has since been released and is recuperating. (R. 70) In a declaration attached to his asylum application dated July 15, 1993, Dong stated further that "if I am sent back to China I will be severely punished for aiding my wife in evading the State policy [and a]dditional punishment will certainly be imposed for leaving China." (R. 145)

The IJ found Dong's testimony to be "credible in every respect." (R. 43) Nevertheless, the IJ denied Dong asylum. The IJ found controlling *Matter of Chang*, Interim Decision No. 3107, 1989 WL 247513 (BIA May 12, 1989), in which the BIA held that the PRC's implementation of its family planning policies ordinarily does not constitute persecution within the meaning of section 101(a)(42)(A) of the Immigration Act. (R. 46–47) The IJ concluded that the damage to Dong's home and the injury to his father was

intended to influence Dong's wife to submit to the PRC's family planning policies. (R. 47) The IJ noted that the damage to Dong's house was limited, and that Dong's father required no medical attention. (R. 45)

On appeal, the BIA affirmed the IJ's order of exclusion, also relying on *Chang*. The BIA found that the actions taken against Dong and his family were "not shown to have been motivated by the imputation of a political opinion to the applicant or by anything other than an effort to implement [the PRC]'s family planning policy by limiting the size of his family." (R. 5) The BIA found further that Dong's experience under the PRC's family planning policy was not "disproportionately severe and hence persecutive." (R. 4) The BIA concluded that, if anything, Dong had a well-founded fear of being prosecuted for violating a validly administered law, not of being persecuted on account of his political opinion. (R. 5) Accordingly, the BIA dismissed Dong's appeal. He then filed this petition for habeas corpus.

## II.

■ A citizen of a foreign country seeking to enter the United States without valid entry documents generally must be deported to the country from which he arrived, 8 U.S.C. §§ 1182(a)(7)(A)(i)(I), 1227(a)(1), unless he is eligible for asylum or temporary withholding of deportation. 8 U.S.C. § 1158; 8 U.S.C. § 1253(h). Eligibility for asylum[1] is a two-step process. The asylum applicant first must demonstrate that he is a "refugee" within the meaning of the Act. 8 U.S.C. § 1101(a)(42)(A). The Act defines refugee as one who is unable or unwilling to return to his country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* These grounds are the only recognized grounds upon which asylum may be based. Second, if the applicant establishes refugee status, he must then prevail upon the Attorney General to grant asylum, 8 U.S.C. § 1158(a), whose decision is "discretionary." *Id.; Carranza–Hernandez v. I.N.S.*, 12 F.3d 4, 7 (2d Cir.1993).

## III.

■ The principal issue presented here is whether the PRC's imposition of its population control policies on a PRC national may in itself constitute "persecution on account of ... political opinion" under the Immigration Act. In *Chang* the BIA held that it may not. Dong maintains that *Chang* is both erroneous and ineffective, and that the BIA's application of *Chang* to his asylum proceeding therefore is erroneous as well.

A court determining the propriety of an agency's construction of a statute that it administers "is confronted with two questions." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). First is whether Congress has directly spoken to the precise question at issue. If Congress has, "that is the end of the matter; the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781. If, however, Congress has not so addressed that question, the second "question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782.

The Immigration Act expresses in general language that an alien who suffers persecution in his country of origin on account of his political opinion may qualify for asylum. It does not explicitly address whether an alien subjected to a country's coercive family planning policy falls within this definition. The legislative history of the Act is silent also, as neither Congress nor the United Nations Protocol and Convention, from which Congress adopted the definition of refugee in the

---

1. Eligibility for asylum is determined by a less stringent standard than eligibility for withholding of deportation. *See I.N.S. v. Cardoza–Fonseca*, 480 U.S. 421, 443–50, 107 S.Ct. 1207, 1219–23, 94 L.Ed.2d 434 (1987); *Carranza–Hernandez v. I.N.S.*, 12 F.3d 4, 7 (2d Cir.1993). An applicant for asylum must establish a "well-founded fear of persecution," while an applicant for withholding of deportation must establish a higher showing of "clear probability of persecution." *Cardoza–Fonseca*, 480 U.S. at 430, 107 S.Ct. at 1212. For convenience, this decision explicitly refers to asylum only, although the analysis and holding apply equally to withholding of deportation.

Immigration Act, *I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 435–37, 107 S.Ct. 1207, 1215–16, 94 L.Ed.2d 434 (1987), confronted this issue. *See* H.R.Conf.Rep. No. 781, 96th Cong., 2d Sess. 19, *reprinted in* 1980 U.S.C.C.A.N. 141, 160; 1967 United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223; 1951 United Nations Convention Relating to the Status of Refugees, 19 U.S.T. 6259.

■ However, Congress has vested in the Attorney General the discretion to determine whether an alien is a refugee. 8 U.S.C. § 1158(a). The Attorney General, in turn, has delegated this discretion to immigration judges and the BIA. The BIA, the highest administrative tribunal empowered to conduct asylum proceedings, 8 C.F.R. § 3.38 (1994), accordingly has been charged with "fill[ing] any gap left, implicitly or explicitly, by Congress" in the Immigration Act, *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974), and its statutory interpretation must control unless it is unreasonable. *See Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782 (a "court may not substitute its own construction of a statutory provision for a reasonable interpretation" by an agency).

In *Chang,* a citizen of the PRC sought asylum based on his having been subjected to the PRC's "one child" policy. The alien in *Chang* argued that he faced sterilization if he returned to the PRC because he and his wife had two children and would not agree to stop having more children. 1989 WL 247513 at 2, 4. The BIA acknowledged that coercive family planning practices such as forced abortions and sterilizations are common, *id.* at 8 n. 2, although it credited a Congressional report which found that the PRC government does not condone such coercive practices and takes measures against local officials who engage in them. *Id.* at 3, 5. The BIA found also that "[e]conomic pressure on families with more than two children can be severe and can include loss of party membership, loss of job, difficulty in purchasing state-supplied [commodities], and other sanctions." *Id.* at 3.

Nevertheless, the BIA concluded that the policy "is [not] on its face persecutive." *Id.* at 4. The BIA found that the PRC "is concerned not only with the ability of its citizens to survive, but also with their housing, education, medical services, and the benefits of life that persons in many other societies take for granted." *Id.* at 5. It noted that the PRC's interest was particularly compelling given its profound population crisis. "For China to fail to take steps to prevent births might well mean that many millions of people would be condemned to, at best, the most marginal existence." *Id.* After reviewing the evidence concerning the implementation of the "one child" policy, it determined that this policy is aimed solely at controlling population. *Id.* at 4–5. The BIA held that the "one child" policy was non-discriminatory, in that it was applied equally to all PRC citizens regardless of their political affiliation, religion, social group, or ethnicity. Accordingly, it concluded that the "one child" policy, "even to the extent that involuntary sterilizations may occur," generally is not a valid basis for asylum. *Id.* at 5. It did not rule that under no circumstances could the "one child" policy be persecutive. Rather, the BIA held that an alien seeking to establish refugee status based on this policy must show that he suffered from the "one child" policy for reasons protected by the Act, such as that it was selectively applied against him because of his particular religion or political opinion. *Id.* at 5.

■ The reasoning in *Chang* is consistent with the Supreme Court's more recent discussion of "refugee status" in *I.N.S. v. Elias–Zacarias,* 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). There, the Supreme Court upheld the BIA's denial of asylum to a Guatemalan national who claimed that he reasonably feared reprisal from a local guerrilla organization that he had resisted joining. The Court premised its decision on "[t]he ordinary meaning of the phrase 'persecution on account of ... political opinion' in" the Immigration Act, which "is persecution on account of the victim's political opinion, not the persecutor's." *Id.* at ——, 112 S.Ct. at 816. The Court found that the alien's refusal to be conscripted was not based on his political opinion, but, rather, on fear "that the government would retaliate against him and his family if he did so." *Id.* The Court found further that the asylum applicant

failed to make the requisite showing "that the guerrillas will persecute him because of [his] political opinion, rather than because of his refusal to fight with them." *Id.* *Elias–Zacarias* therefore obligates an applicant seeking asylum on "political opinion" grounds to show both that he holds a political opinion or is imputed to hold a political opinion, and that he reasonably believes that he will be persecuted because of that political opinion. *Id.*

■■ It follows from the plain meaning of refugee under the Immigration Act, as set forth in *Elias–Zacarias,* that a PRC citizen prosecuted for opposition to a universally applied coercive family planning policy is not being persecuted for his political opinion. Under the "one child" policy, it is not the individual's political opinion or the expression thereof, but, rather, his past or likely future act that exposes him to punishment. The BIA in *Chang* therefore correctly concluded that those "who show that they opposed the policy, but were subjected to it anyway, have [not] demonstrated that they are being 'punished' for their opinions." 1989 WL 247513 at 5. Moreover, the conception and rearing of children is not the inherently political activity whose general prohibition can reasonably be construed as veiled persecution of political opinion. *Cf. Osorio v. I.N.S.,* 18 F.3d 1017, 1030–31 (2d Cir.1994) (union leader's activities organizing a strike and demonstrations "clearly evince the political opinion that ... workers should be given more rights"); *Dwomoh v. Sava,* 696 F.Supp. 970, 979 (S.D.N.Y.1988) ("a coup attempt is a form of expression of political opinion the prosecution of which can qualify as 'persecution' within the statutory definition of 'refugee'"). The absence of political motive here was borne out at Dong's hearing, where he testified that he and his wife decided to have a third child because they wanted a healthy son (R. 65), not that they did so to protest the "one child" policy. That is not a political opinion under *Elias–Zacarias.*

Dong urges this court to rely on *Di v. Carroll,* 842 F.Supp. 858 (E.D.Va.1994), in which the Court refused to apply *Chang.* There, the Court reviewed a series of legislative and executive pronouncements intended to overrule *Chang,* and concluded that "the cacophonous administrative record merits no judicial deference" to *Chang.*[2] 842 F.Supp. at 861. Specifically, the court in *Di* cited: 1) a January 1990 interim rule promulgated by the Attorney General amending the asylum regulations to include as eligible aliens who reasonably fear sterilization because of their country's family planning policies (the "January 1990 Interim Rule"), which was never published as a final rule, *id.* at 863; 2) an executive order calling for "enhanced consideration" for aliens seeking asylum under the January 1990 Interim Rule, *id.;* 3) a July 1990 final rule published by the Attorney General which incorporated none of the provisions of the January 1990 Interim Rule relating to aliens' eligibility for asylum based on their country's coercive family planning policies, and made no reference to such policies (the "July 1990 Rule"), but which superseded the January 1990 Interim Rule, *id.* at 863–64; and 4) a January 1993 final rule promulgated by a new Attorney General, which reiterated the January 1990 Interim Rule, and stated in its explanatory notes that "[o]ne effect of this rule is to supersede ... *Chang*" (the "January 1993 Rule"), but which was withdrawn before publication by the subsequent Administration. *Id.*

■ The Court in *Di* did not specify which particular pronouncement effectively overruled *Chang,* and, indeed, conceded that each is of uncertain legal effect. *See, e.g., id.* at 868 ("the status and legal effect of the 1993 Rule remain unclear"), *id.* at 869 ("the January 1990 Interim Rule likely did not erase or overrule *Chang*"). The Court nevertheless relied on language in *Cardoza–Fonseca,* 480 U.S. at 446 n. 30, 107 S.Ct. at 1221 n. 30, that an inconsistent "agency interpretation ... is entitled to considerably less deference than a consistently held agen-

2. Just as beauty is in the eye of the beholder, cacophony is in the ear of the listener. At least one judge in the Eastern District of Virginia has since disregarded *Di* and explicitly upheld *Chang.* *See Li Zhi Guan v. Carroll,* Civ. A No.

94–410–A at 13 (E.D.Va. May 13, 1994) ("I reach the same issue [in *Di*] and, with respect, I come to a different conclusion.") (bench decision) (attached to 5/24/94 Gov't Ltr.).

cy view," in deciding to disregard all administrative pronouncements on the subject, including *Chang*. *See* 842 F.Supp. at 870. However, where, as here, the interpretation applied by the agency has in fact not changed, such diminished deference is inappropriate. *See N.L.R.B. v. United Food & Commercial Workers*, 484 U.S. 112, 124 n. 20, 108 S.Ct. 413, 421 n. 20, 98 L.Ed.2d 429 (1987) ("[w]e also consider the consistency with which an agency interpretation has been applied"); *see also Lile v. University of Iowa Hosps. & Clinics*, 886 F.2d 157, 161 n. 4 ("While a court may grant lesser deference to agency interpretations where inconsistency between final agency decisions exists, that is not the case [w]here. . . . the inconsistency [does not] lie[ ] between ... final agency decisions") (citation omitted). The policy consistently adhered to by the BIA and applied to aliens seeking asylum based on the "one child" rule is the policy articulated in *Chang*. Under the circumstances presented here, therefore, all that the various pronouncements cited in *Di* suggest is that the legislative and executive branches studiously abstained from overruling *Chang*.

This conclusion is all the more compelling when one considers that the Attorney General has the express authority to formally review any BIA decision, *see* 8 C.F.R. § 3.1(h)(1)(i) (1994), and thus has been free to modify or overrule *Chang* since it was decided over five years ago. In the intervening years, the BIA has consistently applied and explicitly endorsed *Chang, see Di*, 842 F.Supp. at 866 & n. 11 and BIA decisions cited therein, while the Attorney General conspicuously has refrained from repudiating *Chang*. Indeed, as Judge Cedarbaum pointed out in *Peng–Fei Si v. Slattery*, 864 F.Supp. 397, 403 (S.D.N.Y.1994), draft regulations inconsistent with *Chang* were withdrawn by the Acting Attorney General from publication in the Federal Register, and thereby prevented from entering into effect. Absent reversal by the Attorney General, *Chang* remains binding on the BIA. 8 C.F.R. § 3.1(g)-(h) (1994). It is reasonable to conclude therefore that *Chang* is still in force, and is deserving of considerable deference.

■ For similar reasons, I respectfully disagree with the decision in *Xin–Chang Zhang v. Slattery*, 859 F.Supp. 708 (S.D.N.Y. 1994), which held that *Chang* was superseded by the January 1993 Rule notwithstanding that that rule was withdrawn from publication in the Federal Register. The Court in *Zhang* relied on two Second Circuit cases, *Montilla v. I.N.S.*, 926 F.2d 162 (2d Cir.1991) and *New York v. Lyng*, 829 F.2d 346, 354 (2d Cir.1987), and a Ninth Circuit case, *Nguyen v. United States*, 824 F.2d 697 (9th Cir.1987), for the proposition that "where a rule confers a substantive benefit to a person, an agency must comply with it, even if the rule is not published." 859 F.Supp. at 712. But it does not necessarily follow from these cases that a non-published rule be accorded legal effect when it contradicts an agency's consistently applied policy. *Cf. Nguyen*, 824 F.2d at 702 ("the [unpublished agency] Instruction made no change in past agency practices").

## IV.

■ Because *Chang* is neither erroneous nor ineffective, the only remaining issue is whether the BIA correctly applied the *Chang* standard here. In order to secure reversal of a BIA order that applied a proper legal standard, Dong must show evidence in the record that "compels" the conclusion he was persecuted on account of one of the five statutorily protected grounds. *Elias–Zacarias*, 502 U.S. at 481 n. 1, 112 S.Ct. at 815 n. 1. The only evidence in the record, from Dong himself, is that the "one child" policy was applied to him for no other reason than that he had violated it. Dong has not pointed to any evidence that would suggest that he was persecuted on a statutorily protected ground, much less evidence that "compels" such a conclusion. Accordingly, the BIA's determination that Dong does not qualify for asylum because he has failed to prove that he has a well-founded fear that he will be persecuted on account of his political opinion must be upheld, and the petition dismissed.

SO ORDERED.