USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1453 DEBRA ESTEY, ET AL., Plaintiffs, Appellants, v. COMMISSIONER, MAINE DEPARTMENT OF HUMAN SERVICES, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] ___________________ ____________________ Before Torruella, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ ____________________ Patrick Francis Ende, with whom Pine Tree Legal Assistance, Inc. _____________________ ________________________________ was on brief for appellants. Peter D. Coffman, with whom Jay P. McCloskey, United States _________________ _________________ Attorney, Frank W. Hunger, Assistant Attorney General, Michael Jay ________________ ___________ Singer and Deborah Ruth Kant, Department of Justice, were on brief for ______ _________________ appellee. ____________________ April 20, 1994 ____________________ BOWNES, Senior Circuit Judge. Plaintiffs appeal BOWNES, Senior Circuit Judge. _____________________ from a judgment on stipulated facts upholding a policy of the United States Department of Agriculture (USDA) that reduces their food stamp benefits. The district court upheld the USDA policy of counting as income for food stamp purposes the utility reimbursements plaintiffs receive from the Department of Housing and Urban Development (HUD) and from the Farmers Home Administration (FmHA). Estey v. Commissioner, Maine _____ ___________________ Dep't of Human Servs., 814 F. Supp. 152 (D. Me. 1993). _______________________ Because we conclude that the energy-related components of HUD and FmHA utility reimbursements are excluded by statute from income under the Food Stamp Act, we reverse. I. I. BACKGROUND BACKGROUND __________ The defendant-appellees are the Secretary of USDA (Secretary) and the Commissioner of the Maine Department of Human Services, the state agency charged with applying USDA's uniform guidelines in administering the food stamp program in Maine. Plaintiffs are a class of tenants receiving food stamps, paying for household utilities, and living in HUD public housing, in privately-owned "Section 8" HUD-assisted apartments, and in privately-owned FmHA-assisted housing.1 ____________________ 1The class includes [a]ll the persons in the State of Maine who will receive or who have received FmHA and/or HUD utility [reimbursements] anytime since March 1, 1990 and whose food stamp benefits were or will be -2- Plaintiffs, as tenants in HUD and FmHA housing, receive monthly payments, called "utility reimbursements," because all of their utilities are not included in their rent, and because their monthly income is very low relative to average utility costs in their communities. The issue on appeal is whether USDA may count utility reimbursements as income under the Food Stamp Act, 7 U.S.C. 2011-2032, although section 2014(d)(11)(A) of the Act expressly excludes "energy assistance" payments from food stamp income. A. Food Stamp Act A. Food Stamp Act The Food Stamp Act establishes a federally-funded, state-administered program to alleviate malnutrition and hunger in low income households by providing needy persons with coupons to purchase food from retail stores. See id. ___ ___ 2011; Massachusetts v. Lyng, 893 F.2d 424, 425 (1st Cir. _____________ ____ 1990); West v. Bowen, 879 F.2d 1122, 1124 (3d Cir. 1989). ____ _____ USDA establishes uniform standards for food stamp eligibility. See 7 U.S.C. 2014(b). Eligibility depends on ___ income. "Income" is defined as money payable to a household, from whatever source, subject to the exclusions and deductions in the Act. See id. 2014(d)-(e). The exclusion ___ ___ ____________________ wrongfully terminated, reduced, or denied because of the defendant's policy of refusing to exclude FmHA and/or HUD utility [reimbursements] from "income" when determining food stamp eligibility and benefits. Estey, 814 F. Supp. at 154. _____ -3- at issue exempts from food stamp income "any payments or allowances made for the purpose of providing energy assistance under any Federal law." Id. 2014(d)(11)(A). ___ Plaintiffs, as recipients of FmHA and HUD utility reimbursements, are allotted fewer food stamps because USDA interprets the Act to include utility reimbursements as income. B. HUD and FmHA Utility Reimbursements B. HUD and FmHA Utility Reimbursements To frame an analysis of whether utility reimbursements are "energy assistance" under the Food Stamp Act, we outline the regulations on utility reimbursements under the FmHA rental assistance program and the HUD section 8 and public housing programs. In relevant respects, these regulations are identical. Tenants in HUD and FmHA housing pay no more than 30% of household income for rent plus an allowance for any utilities not supplied by the landlord. See 42 U.S.C. 1437a(a)(1); 7 C.F.R. pt. 1930, subpt. C, ___ exhs. B.IV.A.2.c, E.II.E. Water, sewerage, trash collection, electricity, cooking fuel, heat, and hot water are utilities for which allowances may be established. See 24 C.F.R. ___ 813.102, 965.472, 965.476; 7 C.F.R. pt. 1944, subpt. E, exhs. A-5, A-6. The FmHA utility allowance reflects the utility costs incurred by the majority of households in similar units in a housing complex. See 7 C.F.R. pt. 1944, subpt. E, exh. ___ A-6.I, -6.II. HUD utility allowances represent a "reasonable -4- consumption" of utilities "by an energy-conservative household of modest circumstances consistent with the requirements of a safe, sanitary and healthful living environment." 24 C.F.R. 813.102, 965.476(a). To prevent tenants who pay for their own utilities from generally incurring excessive utility costs, HUD and FmHA regulations permit rent (capped at 30% of income) to be offset by an allowance for utilities. See 24 C.F.R. ___ 813.102, 913.102; 7 C.F.R. pt. 1930, subpt. C, exh. E.IX.A.1. This set off results in a payment called a "utility reimbursement" whenever monthly income is very low and utility costs are relatively high. A utility reimbursement is equal to the sum of all allowances for any utilities not supplied by the landlord minus 30% of monthly income. See 24 ___ C.F.R. 813.102, 913.102; 7 C.F.R. pt. 1930, subpt. C, exh. E.IX.A.2. For example, if a tenant's monthly income is $100, $30 (30%) is the total amount the tenant must pay for housing costs, including any utility allowance. If the utility allowance is $5, the tenant will not receive a utility reimbursement, but will owe the landlord only $25 because the allowance is credited against the total amount due. A tenant with the same monthly income, but with a utility allowance of $50, will pay the landlord no rent and will receive a utility reimbursement of $20 (the utility allowance minus 30% of -5- $100). Every tenant entitled to a utility reimbursement receives a bill from at least one utility company. The reimbursement ensures that FmHA and HUD tenants, living in very poor households, will not generally pay more than 30% of household income for energy, water, sewerage, and trash collection costs. II. II. DISCUSSION DISCUSSION __________ Plaintiffs argue that utility reimbursements are "energy assistance," and that section 2014(d)(11)(A) of the Food Stamp Act exempts such assistance from income calculations. USDA contends that this provision, excluding from food stamp income "any payments for the purpose of providing energy assistance," is inapplicable because "energy assistance" is limited to payments made to offset rapidly rising energy costs, whereas utility reimbursements cover routine utility costs.2 ____________________ 2Courts have split over whether USDA may count utility reimbursements as income. See, e.g., West v. Bowen, 879 F.2d ___ ____ ____ _____ 1122 (3d Cir. 1989) (striking down USDA's policy); accord ______ South Dakota Dep't of Soc. Servs. v. Madigan, 824 F. Supp. ___________________________________ _______ 1469, 1477 (D.S.D. 1993), appeal docketed, Nos. 93-2849, 93- _______________ 2869 (8th Cir. July 21 & 23, 1993); Carpenter v. North _________ _____ Carolina Dep't of Human Res., 419 S.E.2d 582 (N.C. Ct. App. _____________________________ 1992). Contra Gore v. Espy, Nos. 2:91-0139, 2:91-0826 ______ ____ ____ (S.D.W.V. March 31, 1993); Scott v. Grunow, No. 1:90-0188 _____ ______ (M.D. Tenn. May 22, 1992); Susan v. Scales, No. S-91-65M _____ ______ (N.D. Ind. May 19, 1992); Garcia v. Madigan, No. H-91-1992 ______ _______ (S.D. Tex. Nov. 29, 1991); Larry v. Yamauchi, 753 F. Supp. _____ ________ 784 (E.D. Ark. 1990); Mitchell v. Block, No. 82-3297-3 ________ _____ (D.S.C. June 22, 1983); Orr v. Arizona Dep't of Econ. Sec., ___ ____________________________ 761 P.2d 1085 (Ariz. Ct. App. 1988). Cf. Maryland Dep't of ___ __________________ -6- A. Standard of Review A. Standard of Review A court reviewing an agency's interpretation of a statute it administers must first determine whether Congress has spoken to the "precise question at issue." Chevron _______ U.S.A. v. Natural Res. Defense Council, 467 U.S. 837, 842 ______ _____________________________ (1984). The precise question in this case is whether "energy assistance" under section 2014(d)(11)(A) encompasses only payments offsetting rapidly rising energy costs. Cf. id. at ___ ___ 840, 845 (noting that precise question at issue is whether EPA's plantwide definition of "stationary source" applies to a statute requiring permits for new or modified stationary sources of air pollution). If Congress's intent on this question is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43. ___ Our review of the district court's construction of the statute is de novo. See Lyng, 893 F.2d at 428. __ ____ ___ ____ In determining congressional intent, we employ the traditional tools of statutory construction, including a consideration of the language, structure, purpose, and history of the statute. See Dion v. Commissioner, Maine ___ ____ ____________________ Dep't of Human Servs., 933 F.2d 13, 15 (1st Cir. 1991). Our _____________________ inquiry begins with an examination of the relevant statutory ____________________ Human Res. v. USDA, 976 F.2d 1462 (4th Cir. 1992) (upholding ___________ ____ USDA's interpretation of exclusion for energy assistance provided under state or local laws). -7- language. American Tobacco Co. v. Patterson, 456 U.S. 63, 68 ____________________ _________ (1982). To be excluded from income under section 2014(d)(11)(A), a payment must be "for the purpose of energy assistance." The Act provides no definition for "energy assistance," but its meaning is generally understood. A payment that provides "assistance" commonly refers to a public subsidy; for example: housing assistance, rental assistance, and medical assistance payments. We assume "`that the legislative purpose is expressed by the ordinary meaning of the words used.'" American Tobacco Co., 456 U.S. ____________________ at 68 (citation omitted). In the absence of a manifestation of legislative intent to the contrary, we conclude that "energy assistance" means what it says: a public subsidy for the purchase of energy. Under this plain reading of the provision, the plaintiffs have no colorable claim unless their utility reimbursements are subsidies for energy. FmHA and HUD utility allowances account for nonenergy utilities such as water, sewerage, and trash collection, as well as energy utilities including heat, electricity, natural gas, and hot water. A tenant directly liable for certain utilities receives a utility reimbursement only if the sum of the allowances for these utilities exceeds 30% of household income. Therefore, a utility reimbursement does not subsidize energy purchases unless the tenant pays at least -8- one energy company for the services provided. Otherwise, a utility reimbursement is not an energy subsidy at all because it assiststhe tenantonly inpaying nonenergyutility providers. In response to the Secretary's argument that utility reimbursements can never be energy assistance because they might offset nonenergy utility costs, plaintiffs contend that utility reimbursements are always energy assistance because they are intended "primarily" for the payment of energy bills. A committee report discussing the energy assistance exclusion states that benefits provided by the Home Energy Assistance Act, and the Energy Crisis Intervention and Energy Crisis Assistance Programs, are "energy assistance." See H.R. Rep. No. 788, 96th Cong., 2d ___ Sess. 122-23 (1980), reprinted in 1980 U.S.C.C.A.N. 843, 955- ____________ 56. Because these programs historically provided food, medicine, and rental assistance, as well as direct subsidies for fuel bills, plaintiffs contend that Congress did not intend "energy assistance" to include payments only for energy utilities. Plaintiffs fail to acknowledge the difference between their utility reimbursements and the benefits provided under the programs discussed in the House Report. According to the report, these programs provided assistance to offset the impact of high energy costs. See id.; see also ___ ___ ________ 45 C.F.R. 1061.51-6(a), 1061.70-8. At issue in this case, -9- however, are utility reimbursements that are designed in part to offset nonenergy utility costs. The analogy suggested by plaintiffs is thus not apt; it does not clarify whether payments designed to account for a mixture of energy and nonenergy expenses are "energy assistance." Neither the energy assistance exclusion's plain language, nor its legislative history evince an intent to exclude payments provided primarily for the purpose of energy assistance. For _________ this reason, we decline plaintiffs' invitation to read the word "primarily" or its equivalent into the statute. The Secretary argues that a utility reimbursement can never be a subsidy for the purchase of energy because the _____ allowance may be based exclusively on nonenergy utility costs. In all likelihood, however, part of every tenant's utility reimbursement is based on an energy-related utility allowance. In fact, some tenants receive utility reimbursements only for energy utilities. Named plaintiff Felix St. Peter's utility reimbursement, for example, is a two party check made jointly payable to him and Maine Public Service Company. See 24 C.F.R. 813.108, 913.108 ___ (providing that HUD utility reimbursements may be made payable to utility providers). The energy and nonenergy components of a utility allowance are itemized when the allowance is approved by FmHA and HUD; this information may be used to determine what fraction of a utility reimbursement -10- is energy-related. FmHA regulations require a landlord to list each utility allowance separately when seeking FmHA approval for the allowance, and to provide this information to the tenant. 7 C.F.R. pt. 1944, subpt. E, exh. A-6.III to -A.6.V. The local public housing agency operating a HUD public housing project must maintain similar lists of utility allowances, and this information is available to the tenant. 24 C.F.R. 965.473, 965.474. Although HUD regulations for section 8 privately-owned housing do not explicitly require that itemized information on utility allowances be retained for the tenant, this is the implication of regulations requiring that HUD or the local public housing agency approve proposed allowances and that allowances be reviewed annually for adjustments. See, e.g., id. 813.102, 882.116, ___ ____ ___ 882.214. We assume that HUD and the local public housing agency would retain records of utility allowances and would make this information available to the tenant whose rent depends on that allowance. Such information may be used to determine how much of a utility reimbursement is in fact a subsidy for energy costs. See South Dakota Dep't of Soc. Servs., 824 F. Supp. ___ __________________________________ at 1477 ("computing the energy and non-energy components of [utility reimbursements] would be a simple matter of arithmetic, not a great administrative burden"). If 60% of a utility allowance is attributable to energy costs, then 60% -11- of the utility reimbursement is a payment assisting the purchase of energy. According to a construction of the statute consistent with its plain language, only 40% of the reimbursement may be counted as income under the Food Stamp Act. -12- B. Structure of the Act: Deductions and Exclusions B. Structure of the Act: Deductions and Exclusions Turning to an analysis of the structure of the Act, we consider whether reading the energy assistance exclusion in context renders counter-intuitive or ambiguous Congress's intent on the meaning of "energy assistance." The Secretary argues that the structure of the Food Stamp Act indicates that utility reimbursements are not "energy assistance." Income eligibility determinations for food stamps resemble income tax calculations, see Department ___ __________ of Health & Welfare v. Block, 784 F.2d 895, 900 (9th Cir. ____________________ _____ 1986); that is, net food stamp income equals gross income, minus any payments that are excluded by statute, minus the standard deduction and any other deductions applicable to the household. The Food Stamp Act's "standard deduction" and "excess shelter cost deduction" account for utility costs. See 7 U.S.C. 2014(e). According to the Secretary, ___ excluding utility reimbursements as "energy assistance" would subtract utility costs twice: once as an exclusion and again as a deduction. The argument that a payment may not be excluded because it offsets a cost already accounted for by the standard deduction is not persuasive. All households, regardless of size, receive the standard deduction, which only in the most general sense reflects energy utility costs, just as it reflects many other costs. The standard deduction -13- is a fixed sum that is adjusted annually according to the Consumer Price Index "for items other than food and the homeowners' costs and maintenance and repair component of shelter costs." 7 U.S.C. 2014(e). The deduction for excess shelter costs specifically accounts for energy utilities, but it does not capture the entire cost of energy utilities. The statute allows a household to deduct shelter expenses, including rent and utilities, only "to the extent that the monthly amount expended by [the] household for shelter" exceeds 50% of the household's income after all other deductions have been taken. Id. Deductible expenses include rent, property ___ taxes, property insurance, and mortgage payments and interest, as well as fuel, electricity, water, sewerage, trash collection, and telephone service. See 7 C.F.R. ___ 273.9(d)(5)(ii). The cap on the deduction is adjusted to reflect changes in the Consumer Price Index for the shelter, fuel, and utilities components of housing costs. 7 U.S.C. 2014(e). According to the Secretary, Congress could not have intended to exclude the energy component of utility reimbursements, given the existence of the excess shelter cost deduction. But the Secretary does not offer an alternative construction of the Act that absolutely precludes deducting energy utility costs whenever energy assistance -14- payments are excluded from income. Even if the energy assistance exclusion were intended to cover only payments offsetting rising energy costs, as USDA contends, any payments designed to offset rising energy costs would be excluded, while the energy costs themselves would be deductible. Implicit in any construction of the energy assistance exclusion is that Congress intended energy assistance to be excluded and energy utility costs to be deducted, to the extent that all shelter costs exceed 50% of monthly income. This is borne out in the legislative history of the energy assistance exclusion: "If a household receives an energy allowance or grant, that allowance or grant is not to be included in income at all, but the energy costs which it covers may continue to be treated as a potentially deductible shelter expense when billed or due." H.R. Rep. No. 788, supra, at 123, 1980 U.S.C.C.A.N. at 956. _____ As a practical matter, there is unlikely to be a substantial overlap between households excluding the energy component of utility reimbursements and those deducting excess shelter costs. Tenants receiving utility reimbursements pay no rent and incur no homeowners' expenses. They are entitled to the excess shelter cost deduction only to the extent that their utility costs alone exceed half of _____ their monthly income, including the nonenergy component of -15- their utility reimbursements.3 In other words, the poorest food stamp recipients living in public housing would exclude the energy component of their utility reimbursements, then deduct the fraction of their utility bills exceeding half of their income. This result is consistent with the Act's purpose to alleviate hunger and malnutrition by augmenting the food purchasing power of participating low-income households. See 7 U.S.C. 2011. We do not find that the ___ structure of the Food Stamp Act requires that the energy assistance provision be construed contrary to its plain language. Our reading of the provision in context reinforces our determination that the plain language manifests Congress's intent. C. Legislative History C. Legislative History ____________________ 3For administrative convenience in calculating the excess shelter expense deduction, a "standard utility allowance" (SUA) may be used in lieu of a household's actual utility costs. 7 C.F.R. 273.9(d)(6). Households receiving "energy assistance" may use the SUA only if they incur "out-of- pocket" heating or cooling expenses. 7 U.S.C. 2014(e). The Third Circuit, having previously found impermissible the USDA policy of counting utility reimbursements as income, see ___ West, 879 F.2d at 1132, subsequently upheld a USDA policy ____ preventing recipients of utility reimbursements from using the SUA unless their actual utility costs exceeded their public housing utility allowances, see West v. Sullivan, 973 ___ ____ ________ F.2d 179 (3d Cir. 1992), cert. denied, 113 S. Ct. 2934 _____________ (1993). Plaintiffs argue that they may use the SUA, even if their utility reimbursements are energy assistance, because they must pay 30% of household income for utilities. We do not address this argument because it is not an issue in this case. -16- We next consider the legislative history of the energy assistance exclusion, to determine whether the legislative intent we find clearly expressed in the statutory language is clouded or contradicted by any statements of members of Congress.4 When the exclusion was enacted in 1980, the House Committee on Agriculture issued a report noting that certain energy grants and allowances, designed to offset the rising cost of energy, had been excluded from food stamp income calculations in prior years by express provisions in other statutes. H.R. Rep. No. 788, supra, at _____ 122, 1980 U.S.C.C.A.N. at 955. The report cites examples of energy assistance programs that were designed to offset the rise in energy costs in the late 1970s and in 1980, id. at ___ 121-22, 1980 U.S.C.C.A.N. at 954-55, and notes that the exclusions for assistance provided under these programs ensured that food stamp recipients would be held "harmless" for their benefits. Id. at 122, 1980 U.S.C.C.A.N. at 955. ___ Preferring that amendments to the Food Stamp Act be made under its aegis, the committee drafted the energy assistance exclusion, which "incorporate[s] the essence" of these prior exclusions. Id. The committee stated that the ___ ____________________ 4We reject the parties' invitation to delve into the language and legislative history of the Housing and Community Development Reauthorization Act of 1992, Pub. L. No. 102-550, 927, 106 Stat. 3672, 3885-86 (1992). That statute addresses neither how utility reimbursements should be treated under the Food Stamp Act, nor the proper interpretation of the energy assistance exclusion. -17- provision would exclude "all energy assistance provided households through the use of Federal, State, or local funds flowing from . . . laws that focus on the problem of energy assistance." Id. at 123, 1980 U.S.C.C.A.N. at 956. The ___ committee further stated that the provision would "exclude from income any direct payments made to households by the Federal Government" under "crisis intervention" or "regular energy assistance" programs. Id. This aspect of the ___ committee report does not define "energy assistance," but does indicate that section 2014(d)(11), by incorporating the essence of similar, program-specific provisions in other statutes, was intended to exclude "any" payments providing energy assistance under "any" federal law. The committee report further states: Where energy assistance provided _________________________________________ households through the use . . . of _________________________________________ Federal, State, or local funds flowing _________________________________________ from Federal, State, or local laws not _________________________________________ specifically dealing with energy _________________________________________ assistance is concerned, such as Aid to _________________________________________ Families with Dependent Children or _________________________________________ General Assistance, the Committee also _________________________________________ intends to guarantee excludability _________________________________________ provided that [USDA] is satisfied that _________________________________________ the increase in benefits awarded by the _________________________________________ State or local government (either on a _________________________________________ matching basis with the Federal _________________________________________ Government or on its own) is, in fact, an _________________________________________ energy assistance-related increase and _________________________________________ not simply a general welfare increase _________________________________________ that would have occurred even were energy _________________________________________ costs not a factor and that, therefore, ___________________ should be viewed as income for food stamp program purposes. Only where energy ___________________ costs are a but-for cause of the _________________________________________ increased payment should the payment be _________________________________________ -18- excluded from income and, then, only to _________________________________________ the extent that the increase is _________________________________________ attributable to high heating costs rather _________________________________________ than general inflationary conditions. _________________________________________ The Committee obviously expects that State legislatures and local councils will . . . not take advantage of this exclusion by labeling every . . . regular welfare allotment adjustment an energy assistance increase in order to take advantage of this exclusion . . . . Id. (emphasis added). ___ The Secretary argues that the highlighted statements support a narrow definition of "energy assistance" for the purpose of section 2014(d)(11)(A). Our scrutiny of the context, however, leads us to conclude that these remarks were prompted by the concern that state and local governments might pass off increases in existing, nonenergy-related welfare program payments as "energy assistance." See ___ Maryland Dep't of Human Res., 976 F.2d at 1470-71. Because _____________________________ the federal government pays the entire cost of food stamp benefits, 7 U.S.C. 2013(a), such a ploy would increase the allotments of food stamps to a state's residents at no substantial cost to the state. To thwart such efforts, Congress subsequently amended the exclusion for energy assistance payments provided under state and local laws.5 ____________________ 5Section 2014(d)(11)(B) excludes from food stamp income, any payments or allowances made for the purpose of providing energy assistance . . . under any State or local laws designated by the State or local legislative body authorizing such payments or allowances as energy -19- See Maryland Dep't of Human Res., 976 F.2d at 1471. Utility ___ ____________________________ reimbursements, in contrast, are provided under federal regulations that specify that the payments account for energy and nonenergy utility costs. Although we do not dispute that the committee intended that "energy assistance" include benefits offsetting the rising cost of energy, the legislative history of the provision reveals no intent to circumscribe the plain language of the provision so that it would apply only to such benefits. Furthermore, we note that the Secretary's interpretation of the energy assistance exclusion causes a result at odds with the legislative history. The 1980 House Report indicates that typical energy assistance programs "hold low-income households harmless by permitting them to buy the same amount of energy they would have utilized in past years without having to diminish their already marginal ____________________ assistance, and determined by the Secretary to be calculated as if provided by the State or local government involved on a seasonal basis for an aggregate period not to exceed six months in any year even if such payments or allowances (including tax credits) are not provided on a seasonal basis because it would be administratively infeasible or impracticable to do so. Unlike the exclusion for federal energy assistance, this statute expressly provides the Secretary a role in determining whether payments designated by state or local governments as "energy assistance" should be counted as income. -20- incomes." H.R. Rep. No. 788, supra, at 122, 1980 _____ U.S.C.C.A.N. at 955. An exclusion for such assistance, according to the House Report, guarantees that low-income households are held harmless for the assistance they receive. Id. Utility reimbursements with energy components are ___ designed in part to ensure that tenants, on average, will be able to purchase energy utilities without spending more than 30% of household income. The allowances underlying these reimbursements are adjusted annually to reflect substantial energy cost increases. See, e.g., 7 C.F.R. pt. 1930, subpt. ___ ____ C, exh. E.IX.C; 24 C.F.R. 882.214, 965.478. In this manner, utility reimbursements ensure that a household's expenditures for energy remain constant as a percentage of household income, from year to year. USDA's practice of counting the energy component of utility reimbursements as income does not hold tenants "harmless" for the assistance they receive. The Secretary argues that Congress ratified USDA's interpretation of the statute when it amended the energy assistance exclusion in 1988. Prior to 1988, section 2014(d)(11)(A) exempted from income "any payments or allowances made under any Federal law for the purpose of providing energy assistance." See West v. Bowen, 879 F.2d at ___ ____ _____ 1130. Congress reworded the statute in 1988 so that the provision currently excludes "any payments or allowances for -21- the purpose of providing energy assistance under any Federal law." A Senate committee report indicates that this "technical amendment" clarified that USDA and local agencies do not need to conduct an inquiry into the purpose of a federal statute before excluding federal "payments for the purpose of energy assistance." The law as now written could be read to require this analysis. The crucial question should be whether the purpose of the payment is energy assistance, not whether the statute, as a whole, is primarily for energy assistance or includes other human services as well. This change is not intended to change _________________________________________ current policy. _______________ S. Rep. No. 397, 100th Cong., 2d Sess. 28-29, reprinted in ____________ 1988 U.S.C.C.A.N. 2239, 2266-67 (emphasis added). The Secretary urges us to read the last sentence in the quoted text as endorsing the agency's policy of ________ restricting the definition of energy assistance solely to payments offsetting dramatic increases in the cost of energy. The problem with the Secretary's argument is that USDA's policy of applying the exclusion only to payments offsetting dramatic increases in the cost of energy did not exist at the time the Senate Report was drafted. Although USDA treated utility reimbursements as income before 1988, the agency based this practice on the faulty interpretation of the energy assistance exclusion that the 1988 amendment was designed to correct. The two cases construing the statute -22- prior to 1988, West v. Bowen, No. 84-3883 (E.D. Pa. Dec. 17, ____ _____ 1987), rev'd, 879 F.2d 1122 (3d Cir. 1989) and Mitchell v. _____ ________ Block, No. 82-3297-3, slip op. at 10 (D.S.C. June 22, 1983), _____ held, consistent with USDA's interpretation at that time, that utility reimbursements are not "energy assistance" because they were authorized by federal housing laws, rather _______ than energy assistance laws.6 _________________ Viewed in this light, the plaintiffs' interpretation of the 1988 amendment and the Senate Report is more persuasive: the amendment was not intended to change congressional policy, but in effect it repudiated the _____________ agency's litigation position by clarifying that any payments ___ for energy assistance be excluded, regardless of the purpose of the law authorizing the payments. Further support for this interpretation is that the committee described the rewording of the statute as a "technical amendment." The statement in the legislative history that the amendment "is not intended to change current policy" reaffirms that it is not a substantive revision of the statutory language. The Secretary's final argument based on the legislative history is that Congress expressed tacit approval of USDA's interpretation by leaving it in place when it ____________________ 6The district court in Mitchell cited the legislative history ________ of the energy assistance exclusion as an alternate basis for upholding the practice of counting utility reimbursements as income. See Mitchell, No. 82-3297-3, slip op. at 13-28. ___ ________ -23- amended the statute in 1988. Inaction may signify acquiescence to an agency interpretation. See, e.g., Bob ___ ____ ___ Jones Univ. v. United States, 461 U.S. 574, 600-01 (1983). A ___________ _____________ logical prerequisite to inferring approval or ratification from silence is that the agency's interpretation antedates any relevant amendments. That is not so here. Although USDA has invariably deemed utility reimbursements to be income under the Food Stamp Act, the agency's rationale for this practice has changed over time. Prior to the 1988 amendment of the Act, the agency asserted in litigation that the exclusion applied only to payments made under federal laws specifically enacted to provide energy assistance. The 1988 amendment condemned this interpretation, see West v. Bowen, ___ ____ _____ 879 F.2d at 1322, and the agency abandoned it in favor of the position it espouses in this case, that "energy assistance" refers only to payments offsetting rapidly rising energy costs. The interpretation of the statute at issue on appeal thus does not predate the 1988 amendment. We have considered USDA's unvarying treatment of _________ utility reimbursements as an "interpretation" of the statute capable of ratification by silence, but we do not find great significance in Congress's inaction. "Congressional inaction frequently betokens unawareness, preoccupation, or paralysis." Zuber v. Allen, 396 U.S. 168, 185-86 n.21 _____ _____ (1969). Legislative silence is most significant when the -24- "area is one of traditional year-by-year supervision, like tax, where watchdog committees are considering and revising the statutory scheme." Id. In the baker's dozen years that ___ have passed since the Food Stamp Act energy assistance exclusion was enacted, the Act has been amended many times, but the exclusion itself has been amended only twice. The 1981 amendment affected only the provision excluding state and local energy assistance payments. The legislative history of the 1988 amendment reflects a senate committee's appreciation that USDA misread the statute, but does not indicate the committee's awareness of USDA's treatment of utility reimbursements. See S. Rep. No. 397, supra, at 28, ___ _____ 1988 U.S.C.C.A.N. at 2266 (stating that "USDA and local agencies do not need to conduct an inquiry into the purpose of a federal statute before excluding" energy assistance). Therefore, even if what the senate committee recognized about the agency's prior misreading of the statute were attributable to the entire Congress, this would not prove congressional cognizance of the treatment of utility reimbursements. There are still fewer facts outside the legislative history supporting an inference of congressional awareness. USDA has not embodied its interpretation of the federal energy assistance exclusion in a regulation. Moreover, our research uncovered nothing suggesting that the agency -25- embodied its position on utility reimbursements in any agency publication prior to 1990, when it issued policy statements on the matter. And the only courts considering USDA's treatment of utility reimbursements prior to 1988 issued unpublished opinions. E.g., West, No. 84-3883; Mitchell, No. ____ ____ ________ 82-3297-3. Furthermore, the policy of including utility reimbursements in food stamp income affects only very poor FmHA and HUD tenants, persons unlikely to have the resources to publicize their plight. We cannot infer from the legislative history and from these facts that congressional silence signals ratification of the agency's policy. Nor do we find in the legislative history any statements belying our determination that Congress's intended meaning for the energy assistance exclusion is manifested by its plain language. D. Deference D. Deference The Secretary argues that we must defer to the agency's judgment on the applicability of the energy assistance exclusion to utility reimbursements because this authority has been expressly delegated to the agency. According to the Secretary, Congress explicitly called on USDA to determine whether any payments provided under federal "laws not specifically dealing with energy assistance" were "energy-assistance related." H.R. Rep. No. 788, supra, at _____ 123, 1980 U.S.C.C.A.N. at 956. An agency's reasonable construction of a statute is entitled to deference when -26- Congress delegates to the agency the power to interpret the statute. See St. Luke's Hosp. v. Secretary of Health & Human ___ ________________ ___________________________ Servs., 810 F.2d 325, 331 (1st Cir. 1987). ______ We previously quoted the passage from the House Report cited by the Secretary in support of this argument, see H.R. Rep. No. 788, supra, at 123, 1980 U.S.C.C.A.N. at ___ _____ 956, and we noted that the remarks reflected the committee's concern that state or local governments might pass off increases in general welfare as energy assistance. Utility reimbursements, in contrast, are authorized by federal regulations specifying that the payments account for energy utility costs. The legislative history cited by the Secretary does not empower USDA to refine the energy assistance exclusion so that it does not apply to the energy component of a utility reimbursement. Finally, the Secretary contends that USDA's policy should be upheld because, under Chevron, courts must defer to an agency's _______ reasonable interpretation of a statute it administers. Chevron prescribes that courts employ a two-step analysis of _______ an agency's interpretation of a statute it administers. See ___ Dion, 933 F.2d at 14-15. Deference is appropriate only when ____ the legislative intent is unclear. See St. Luke's Hosp., 810 ___ ________________ F.2d at 331. In this case, the plain language of the statute manifests Congress's intent on the question at issue: any payment designed to offset energy costs is excluded from food -27- stamp income, not just payments offsetting rapidly rising energy costs. We conclude that the energy component of a HUD or FmHA utility reimbursement, as a subsidy for the purchase of energy, must be excluded from food stamp income calculations. Any policy of USDA to the contrary is impermissible. The decision of the district court is therefore Reversed. Reversed. _________ Dissent follows. Dissent follows. -28- CYR, Circuit Judge (dissenting). Although the court CYR, Circuit Judge (dissenting). ______________ proposes a plausible alternative, I cannot agree that the Exclusion 11 interpretation adopted by the United States Department of Agriculture ("USDA") is "arbitrary, capricious, or manifestly contrary to the statute." Chevron U.S.A., Inc. v. _____________________ National Resource Defense Council, 467 U.S. 837, 844 (1984). Not _________________________________ only are statutory interpretations by an administering agency entitled to deferential review, id., but the rationale underlying ___ the Chevron doctrine is fully implicated in this case. I would _______ therefore accord Chevron deference to USDA's interpretation of _______ the pivotal language "energy assistance [payments]," as excluding ordinary utility reimbursements ("URs"). First, the omnibus regulatory scheme established under the Food Stamp Act ("FSA") is "technical and complex" both in its literal statutory manifestation and in its interdependent implementation with several elaborate federal and state public assistance statutes administered by other agencies (e.g., HUD and ____ FmHA). See id. at 865; Maryland Dep't of Human Resources v. ___ ___ ___________________________________ United States Dep't of Agric., 976 F.2d 1462, 1470 (4th Cir. _______________________________ 1992). As a consequence of its accustomed immersion in the intricacies of the FSA, and its intimate familiarity with related statutory schemes, the USDA, like other administering agencies, ordinarily is presumed to have the confidence of Congress in affording interstitial interpretations of statutes entrusted to its administration. See Chevron, 467 U.S. at 865 ("Judges are ___ _______ -27- 27 not experts in the field . . . ."); Sierra Club v. Larson, 2 F.3d ___________ ______ 462, 468-69 (1st Cir. 1993); Aronson v. IRS, 973 F.2d 962, 965 _______ ___ (1st Cir. 1992); Evans v. Commissioner of Maine Dep't of Human _____ _____________________________________ Servs., 933 F.2d 1, 7 (1st Cir. 1991). Further, as a politically ______ accountable executive agency, generally speaking the USDA should be left to "strike the [policy] balance" not struck by Congress, and to reach "a reasonable accommodation of manifestly competing _________ interests." Chevron, 467 U.S. at 865-66 (emphasis added). The _______ policy choices plainly implicated by the FSA's provisions on _______ income inclusion and exclusion, and Congress's repeated failure to countermand USDA's longstanding policy favoring inclusion of URs, see Zemel v. Rusk, 381 U.S. 1, 12 (1965), present a textbook ___ _____ ____ case for Chevron deference. Lastly, ever since 1980, after _______ considering Exclusion 11 and its legislative history "in a detailed and reasoned fashion," Chevron, 467 U.S. at 865, the _______ USDA consistently has concluded that Congress did not intend to insulate food stamp recipients from energy cost increases that routinely accompany inflationary rises in the nature of "normal household living expenses." 7 C.F.R. 273.9(c)(5) (1993). I readily acknowledge, of course, that Chevron does not _______ dictate judicial deference to agency interpretations in all circumstances. See, e.g., Larson, 2 F.3d at 468 (under Chevron, ___ ____ ______ _______ "courts have the last word on statutory interpretation [and] the question is one of how much weight to be accorded to agency ___ ____ ______ views") (emphasis added). In my view, however, after charting the course for its two-tiered Chevron inquiry, the court _______ -28- 28 misplaces its compass by withholding deference on impermissible grounds. The overarching aim of the Chevron analysis is to _______ determine "whether Congress has directly spoken to the precise _______ question at issue." Chevron, 467 U.S. at 842 (emphasis added); ________ _______ see K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291-92 (1988) ___ _____________ _____________ ("[A] reviewing court must first determine if the regulation is _____ consistent with the language of the statute . . . [or] [i]f the __________ statute is silent or ambiguous with respect to the specific issue ________ _____ addressed by the regulation . . . .") (emphasis added). In the _________ __ ___ __________ present case, the court frames the inquiry less precisely than Chevron requires. See supra p. 7 (the issue is "whether 'energy _______ ___ _____ assistance' under [Exclusion 11] encompasses only payments offsetting rapidly rising energy costs"). Under the Chevron _______ framework, the "precise question," Chevron, 467 U.S. at 842, thus _______ the controlling one, is much more narrowly focused: Has Congress expressed a "specific intention" to include or exclude HUD and FmHA URs from the ambit of the phrase "payment[s] . . . for energy assistance"? Cf. id. at 845 (inquiring whether Congress ___ ___ evinced its "specific intention" to apply EPA's proposed "bubble concept" to the statutory term "stationary [air pollution] source"). Language, Structure, and Purposes of the FSA and Exclusion 11 Language, Structure, and Purposes of the FSA and Exclusion 11 _____________________________________________________________ If the undefined term "energy assistance [payment]" has a plain and determinate meaning under the FSA, as the court suggests, see supra p. 8 ("a[ny] public subsidy for the purchase ___ _____ -29- 29 of energy"); but cf. Dion v. Commissioner of Maine Dep't of Human ___ ___ ____ ____________________________________ Resources, 933 F.2d 13, 15-16 (1st Cir. 1991) (rejecting USDA _________ interpretation of "child," based on FSA's variant uses of same ____ term), then the initial prong under the Chevron inquiry is met, _______ and the USDA cannot prevail no matter how plausible its interpretation. See Public Employees Retirement Syst. v. Betts, ___ __________________________________ _____ 492 U.S. 158, 171 (1989). However, the USDA does not disagree that the term "energy assistance [payment]," viewed in isolation, is susceptible to more expansive interpretation. Rather, it contends that the statutory and historical contexts of Exclusion 11 support the narrower construction given it by the agency. See ___ Skidgel v. Maine Dep't of Human Servs., 994 F.2d 930, 937 (1st _______ ____________________________ Cir. 1993) ("plainness" of legislative language must be considered in the context of the entire statute and its policy ______ ______ goals); see also National R.R. Passenger Corp. v. Boston & Maine ___ ____ _____________________________ ______________ Corp., 112 S. Ct. 1394, 1401 (1992) (same). Thus, at least three _____ related impediments must be overcome before the term "energy assistance [payment]" can be considered sufficiently "plain" to warrant withholding Chevron deference in this case. _______ First, at the same time it explicitly added "income" ______ exclusions to the FSA in 1977, Congress clearly evidenced its __________ intention that the statute's "broad-gauged definition of income ____________ . . . measure income as broadly as possible to be fair to all ______ __ _______ __ ________ ____ [FSA] recipients as well as to the tax-paying public and not __________ ______ simply by reference to purchasing power available for food." H.R. Rep. No. 464, 95th Cong., 1st Sess. 27 (1977), reprinted in _________ __ -30- 30 1977 U.S.C.C.A.N. 1978, 2004; see 7 U.S.C. 2014(d) ("Household ___ income for purposes of the [FSA] shall include all income from ____ whatever source excluding only . . . .") (emphasis added). Given ________ ______ _________ ____ this historical context, it would seem appropriate to recognize that the FSA's broadly gauged "income" inclusion provision strongly suggests that exclusions from "income" under the FSA are to be strictly limited, lending considerable rational force to the USDA's limiting interpretation of the Exclusion 11 term "energy assistance [payments]." Cf., e.g., Commissioner v. ___ ____ ____________ Jacobson, 336 U.S. 28, 49 (1949) (Internal Revenue Code's ________ deliberately broad definition of taxable "income" necessitates limiting interpretation relating to exemptions). Second, the court concedes that the entire phrase ______ "energy assistance [payments]" not merely its discrete component "energy assistance" is ambiguous in one important _________ and unmistakable respect; viz., viewed as a unitary federal ___ _______ assistance payment, the average HUD or FmHA UR unlike, for example, a payment made pursuant to the Low Income Home Energy Assistance Act, see supra pp. 9-10 obviously is not purely a ___ _____ ___ ______ "payment[] or allowance[] made for the purpose of providing energy assistance," but often includes various nonenergy components (e.g., water charges, trash collection charges). The ____ court proposes to avoid the looming interpretive dilemma in its path by requiring the agency to segregate these nonenergy UR -31- 31 components from the energy component. See supra pp. 10-11.7 As ___ _____ the district court aptly noted, however, the entire phrase "payments . . . made for the purpose of energy assistance" ________ suffers from a latent ambiguity and raises a serious question as to whether the 96th Congress ever considered the possibility that Exclusion 11 might be interpreted to include discrete portions of ________ "mixed" or multi-purpose utility payments like HUD and FmHA URs. _______ Finally, the conclusion that the USDA interpretation is at odds with the legislative policy underlying the FSA does not withstand scrutiny. Recipients of HUD and FmHA URs can lay claim to no special burden under the food stamp scheme. Congress _______ itself has recognized the principle of "fairness" which underlies ____________________ 7Given the FSA's complex structure, and the internal cross- references in Exclusion 11 to other federal and state statutes of comparable complexity, it is difficult to accept the facile conclusion that segregation of the energy component from the nonenergy components in URs would pose no significant administrative burden. The USDA vigorously insists otherwise, and the district court prudently bypassed the entire administrative implementation issue. See Estey, ___ _____ 814 F. Supp. at 158 n.2. On the other hand, this court bases its "minimal administrative burden" thesis solely on an examination of the cold appellate record, including the FSA, HUD, and FmHA implementing regulations, without the benefit of a developed record relating to the types of problems which might portend serious administrative burdens. The USDA does not set, monitor, or control HUD or FmHA utility allowances, nor the annual adjustments to those ___________ allowances. Thus, even though segregation may appear a "simple matter of arithmetic" in the abstract, it cannot simply be assumed that segregation would not entail elaborate inter-agency monitoring and policing for example, between the USDA and HUD to ensure that food stamp recipients correctly declare the appropriate components of their URs as excludible income. Absent some contrary evidence, therefore, the USDA's assessment of the likely burdens entailed in implementing such an administrative regime warrants prima facie deference. -32- 32 the FSA's narrowly-drawn income exclusions, and the competing interests at stake in any benefit allocation made by government. See H.R. Rep. No. 464, supra, at 27. While acknowledging that ___ _____ families with the lowest incomes often feel the financial brunt of this congressional policy choice, the USDA assiduously acts to further that legislative policy by treating as includible income __ __________ ______ many other routine and need-based assistance payments which ____ _____ _______ ___ __________ increase a family's real purchasing power. See, e.g., 7 C.F.R. ___ ____ 273.9(b) (2)(i) (supplemental SSI and AFDC, and "other assistance programs based on need" are includible in food stamp _____ __ ____ "unearned income") (emphasis added); id. 273.9(b)(2)(ii) ___ (veteran's and unemployment compensation payments); id. ___ 273.9(b)(2)(iv) (scholarships). Thus, notwithstanding the strong humanitarian preference for affording maximum nutritional benefits to needy families, it is precisely this type of policy balancing, and allocation of finite governmental resources, that Chevron normally ordains be left to politically accountable _______ administering agencies rather than the courts. See Chevron, 467 ___ _______ U.S. at 866 ("[F]ederal judges who have no constituency have a duty to respect legitimate policy choices made by those who do."). In sum, the "precise question" for determination under the Chevron analysis is whether the FSA evinces Congress's _______ "specific intention" to bring HUD and FmHA UR payments within Exclusion 11. Although in my view the operative phrase "payments . . . for energy assistance" is ambiguous, the very least these -33- 33 three impediments to a "plain" language interpretation require is careful attention to any relevant legislative history which might throw light on its meaning. -34- 34 Legislative History of FSA and Exclusion 11 Legislative History of FSA and Exclusion 11 ___________________________________________ The focus of the search is on any historical evidence of a specific congressional intent to classify URs as "energy assistance" payments or, alternatively, evidence that Congress left this type of definitional task to agency expertise. See ____ ___ Chevron, 467 U.S. at 844 ("Sometimes the legislative delegation _______ to an agency on a particular question is implicit rather than explicit."). The relevant legislative history confirms that Exclusion 11 is at least ambiguous on the matter at issue. See ___ Dion, 933 F.2d at 16 (looking to legislative history to confirm ____ nonambiguity of statutory language). I readily agree with the court that its proposed interpretation of the various pre-enactment committee reports is eminently reasonable. On the other hand, the USDA points to several references in the committee reports suggesting that Congress, in the wake of the unprecedented OPEC oil crisis, __ ___ ____ __ ___ _____________ ____ ___ ______ contemplated no exclusion from "income" for federal "energy assistance" payments to FSA recipients, except for ______ "extraordinary" energy expenses not already addressed through the "ordinary mechanisms" in the FSA for accommodating normal infla- tionary cost-of-living increases. S. Rep. No. 394, 96th Cong., 2d Sess. 111 (1980), reprinted in 1980 U.S.C.C.A.N. 410, 520. _________ __ The pivotal Committee Report, H.R. Rep. No. 788, 96th Cong., 2d Sess. 122-23 (1980), reprinted in 1980 U.S.C.C.A.N. _________ __ 843, 955-56 [hereinafter: "House Report No. 788"], see supra pp. ___ _____ 17-18, cites to particular examples of recently enacted federal ________ -35- 35 statutes providing "payments . . . for the purpose of energy assistance." See, e.g., Home Energy Assistance Act, 94 Stat. 229 ___ ____ (1976) (formerly codified at 42 U.S.C. 8601-8612 (1976)) (repealed and reenacted as Low Income Home Energy Assistance Act, Pub. L. No. 97-35, 2601-2610, 95 Stat. 893 (1981) (codified at 42 U.S.C. 8622-8629 (1982))) [hereinafter: LIHEAA or LIHEAP]; see also S. Rep. No. 394, supra at 111 (committee report on ___ ____ _____ LIHEAA). House Report No. 788 noted that the federal "interven- tion" payments authorized under these "new" programs had enabled low income households to "meet the dramatic increases in home ________ _________ heating costs," "to buy the same amount of energy they would have utilized in past years without having to diminish their already marginal incomes," and thereby "represent[] more of a wash transaction than any real increase in the [FSA] recipient or ____ ________ benefited household's purchasing power." H.R. Rep. No. 788, __________ _____ supra, at 122 (emphasis added). _____ Although these references may not compel the ______ interpretation adopted by the USDA, they surely support a _______ permissible inference that this was the specific type of federal ____ "energy assistance" payment targeted by Exclusion 11. Having promptly adopted this statutory gloss, both in its regulatory definition, see 7 C.F.R. 273.9(c) (5) (FSA "income" includes ___ all reimbursements for "normal household living expenses" which "do not represent a gain or benefit to the household"), and in practice, the USDA maintains that FSA income exclusions for reimbursements of routine energy costs would go well beyond _______ -36- 36 merely holding FSA recipients "harmless," for the obvious reason that the FSA, HUD, and FmHA programs already contain mechanisms for taking into account any general inflationary energy increases (e.g., FSA's "standard" and "excess shelter" deductions). ____ Similarly, House Report No. 788 demonstrates that Congress did not hesitate to delegate significant discretion to the USDA to determine which state-paid benefits are properly _____ classified "energy assistance [payments]" under Exclusion 11, see ___ H.R. Rep. No. 788, supra, at 123 ("provided that [the USDA] is _____ satisfied that the increase in [state or local] benefits . . . is, in fact, an energy assistance-related increase and not simply a general welfare increase") (emphasis added). Significantly, one criterion Congress established for guiding the USDA's classification of these benefits is that state benefit increases could only be considered "energy assistance [payments]" "to the __ ___ extent that the increase is attributable to high heating costs ______ ____ rather than general inflationary conditions." Id. (emphasis ___ added). "Hold Harmless" Payments "Hold Harmless" Payments _______________________ The court offers two rejoinders to the USDA's reading of the legislative history. With respect, I believe both are flawed. First, moving beyond its questionable conclusion that nothing in House Report No. 788 confirms the USDA's inter- ________ pretation of "energy assistance [payments]," the court states that the USDA's policy choice is "at odds" with the legislative ______ ______ history. See supra p. 19. The court's statement presumably ___ _____ -37- 37 stems from two premises: (1) USDA's practice of including URs as food stamp "income" fails to hold food stamp families "harmless" by ensuring that "a household's expenditures for energy remain constant as a percentage of household income, from year to year," and (2) hypothetical UR payments might sometimes contain reimbursements for superinflationary energy cost increases, for which URs would hold tenants "harmless." In order to assess the soundness of these two premises, it is necessary first to determine what Congress meant when it said that the "new" energy programs were designed to hold recipient families "harmless" for ________ "energy assistance" payments, LIHEAP being a known type of "new" _____ ____ energy assistance payment. Congress enacted LIHEAA intending that "new" programs of its type would supplement preexisting governmental assistance __________ programs which had not previously provided benefit adjustments to ___ ___ low income households to account for energy cost increases which outpaced general cost-of-living increases. See S. Rep. No. 394, ________ ___ supra, at 111 (expressing concern that "the ordinary mechanisms _____ ________ __________ for adjusting income assistance programs to the rising costs of living may be inadequate to meet the extraordinary increases __________ _____________ which have taken place in energy costs") (emphasis added). Thus, when enacting LIHEAA, Congress ostensibly determined that preexisting statutory mechanisms for making adjustments for "substantial [energy rate] increases," like those already incorporated in the FSA, HUD and FmHA programs, were ill-designed to offset recent and unprecedented "spike" increases in energy -38- 38 costs, and opted to reimburse food stamp recipients in full for __ ____ all otherwise unreimbursed expenditures for these past and future "spike" increases. Cf. 42 U.S.C. 8624(f) (LIHEAP payments not ___ includible as "income" in calculating food stamp entitlements). Thus, in two senses, food stamp recipients realized no real ___ ____ "gain" from LIHEAA: (1) LIHEAP payments merely offset super- inflationary energy cost increases, and food stamp recipients were simply restored to their pre-OPEC financial position, so as to afford them the same amount of energy as before the oil ____ ______ __ ______ crisis, without loss of real spending power, and (2) since these ___ superinflationary energy cost increases were not being offset by any other statutory cost-of-living assistance provision, LIHEAP payments would effect no double compensation, or "gain," to food ______ stamp families. In these respects, therefore, LIHEAA worked a complete "wash." ________ On the other hand, consider the following hypothetical calculations of representative housing assistance payments and URs: 1990 1991 ____ ____ approved rent $300 $300 + utility allowance $ 60 $ 72 ____ ____ = approved shelter cost $360 $372 - 30% family income $ 45 $ 45 of $150 _______________________ ____ ____ housing assistance $315 $327 payment - approved rent $300 $300 _______________________ ____ ____ utility reimbursement $ 15 $ 27 -39- 39 The utility allowance, which may or may not reflect actual ______ utility costs, is an average figure calculated by the "landlord" for all units in a covered facility, and is designed to afford tenants an "adequate" allowance for household utilities, while deterring inefficient energy usage. As the court points out, "substantial" annual increases in energy rates (e.g., more than ____ 10%) might require the "landlord" to make corresponding increases in the pre-set utility allowance. See 7 C.F.R. pt. 1930, subpt. ___ C, exh. E.IX.C; 24 C.F.R. 882.214, 965.478. So, in our hypo- theticals, if utility rates increased to $72 over one year, a 20% increase, the tenant's UR would increase from $15 to $27. If the general or across-the-board inflation rate for the same year were only 15%, then one-quarter of the $12 increase in the UR paid to the tenant, or $3, could be considered an additional reimburse- _____ ment for utility cost increases beyond the general inflationary rate, and some lesser portion of that segregable payment of $3 would be for superinflationary energy (as opposed to nonenergy ______ utility) price increases. Accordingly, our hypothetical $27 UR would include three components: basic energy cost ($15), general inflationary increase ($9), and superinflationary increase ($3). When the identical "hold harmless" analysis just applied to LIHEAP is applied to the housing URs Congress established prior to its enactment of LIHEAA, the flaw in the thesis advanced by the court becomes clear.8 Unlike LIHEAP ____________________ 8The court concludes that "USDA's practice of counting the energy component of [URs] as income does not hold tenants 'harmless' for the assistance they receive." See supra pp. ___ _____ -40- 40 payments, URs simply are not payments made pursuant to a "new ___ program" as specifically referred to in House Report No. 788. [See supra p. 9.] For example, HUD's section 8 housing ___ _____ legislation was enacted in 1974, see P.L. No. 93-383, 201(a), ___ 88 Stat. 653 (1974) (codified at 42 U.S.C. 1437), well before Congress can reasonably be thought to have foreseen the superinflationary energy price increases experienced in the late 1970s. When URs were first established, therefore, Congress _____ could not have contemplated, let alone intended, that the UR's "basic cost" component ($15) or its "general inflation" component ($9) would hold recipient families "harmless" in the two special ___ senses in which LIHEAA later benefited its recipients. Prior to their initial entitlement to URs, low income families presumably paid the full $60 utility cost from income; whereas immediately after the establishment of URs, it cost the same family only $45 to purchase the same amount of energy it had purchased for $60 ____ ______ the previous year. Congress established the "basic cost" component in utility allowances and URs to reduce the percentage ______ of household income that must be expended for energy regardless __________ of past inflationary trends. Thus coupled with an adequate internal mechanism for making future adjustments for general inflationary increases, the UR worked a real $15 increase in ________ overall purchasing power, not merely a "wash." ____________________ 20-21. Regardless whether this is the right answer, however, the court has not posed the right question. The appropriate inquiry is whether these HUD and FmHA housing programs were _______ intended to hold families harmless in the same way LIHEAA was meant to do. -41- 41 At most, therefore, the court has demonstrated in theory that the USDA might be required at some time in the future to exclude a relatively small portion of some URs from food stamp "income"; viz., the $3 (or less) of the hypothetical $27 UR ____ attributable to any "superinflationary component." But this theory inevitablyimports seriousconceptual impediments ofits own. First, in defense of this theory the court disregards __________ the unitary nature of UR payments, opining that the USDA can _______ easily segregate URs into their energy and nonenergy components, thereby smoothing the path for its conclusion that the UR's energy component alone qualifies for "exclusion" from FSA "income." See supra pp. 10-11; but cf. supra pp. 31-32. Having ___ _____ ___ ___ _____ thus disregarded the unitary nature of UR payments, the court cannot then credibly suggest that the USDA would be acting arbitrarily by segregating and excluding from FSA income a UR's _________ ____ ___ ______ hypothetical superinflationary component ($3) while at the same time including the UR's "basic cost" ($15) and "general inflation" ($9) components in FSA income. Second, and more importantly, no part of any UR will include such a super- inflationary component during periods of subinflationary, stable, or declining energy prices. Indeed, the USDA concedes that it may be appropriate to exclude from FSA income a UR which actually ________ represents a reimbursement for superinflationary energy increases. Given general economic trends in the late 1980s and early 1990s, however, appellants advisedly have not argued that their own URs covered any superinflationary energy price -42- 42 increases, nor do they suggest that USDA has attempted to include any such superinflationary component in any other food stamp recipient's "income." Rather, the USDA continues to include HUD and FmHA URs in food stamp "income" on the theory that unless proven to contain some superinflationary component, current HUD and FmHA URs presumably reimburse only "routine" energy costs and subinflationary increases in energy costs. The current USDA _______________ regulations flexibly track this presumption by reference to the includibility of all reimbursements for "normal household living expenses." As a consequence, I find no support for the thesis that the USDA's policy choice is "at odds" with the legislative history. State "Energy Assistance" Payments State "Energy Assistance" Payments __________________________________ As its second rejoinder, the court takes the position that the language quoted from House Report No. 788, see supra at ___ _____ pp. 17-18, considered in context, can lead to one reasonable conclusion only that Congress was particularly concerned that "state and local governments might pass off increases in existing, nonenergy-related welfare program payments as 'energy assistance'" so as to shift local welfare burdens to federally- funded programs (e.g., the FSA program). Once again, however, ____ this thesis does not withstand close scrutiny, let alone begin to dispel the plausibility of the alternative view advanced by the USDA. If this sort of burden shifting had indeed been a matter of significant legislative concern, it would have been a -43- 43 simple matter for Congress to authorize a FSA income exclusion for all bona fide energy cost assistance paid to food stamp ____ ____ recipients by the States. All Congress need have done is to require States to satisfy the Secretary that any increases in state-paid benefits were for food stamp recipients' energy cost increases, rather than their nonenergy cost increases. In addition to its threshold requirement that energy cost increases be the "but-for cause" of any increase in a state's reimbursements, however, Congress imposed a second, subsidiary condition: even a state's bona fide energy-related ____ ____ reimbursements should be exempt under Exclusion 11 "only to the __ ___ extent that the [benefit] increase is attributable to high ______ ____ heating costs rather than general inflationary conditions." The _______ _____ _______ ____________ __________ court has not explained how Congress could have meant to thwart improper diversions of State welfare program costs by prohibiting FSA income exclusions for bona fide subinflationary energy cost ____ ____ reimbursements by a State, if federal payments for the same purposes were readily excludible from food stamp income. In sharp contrast, the reading given House Report No. 788 by the USDA dovetails neatly with the stated goals of "new" federal programs, such as LIHEAA, which Congress referred to as prototypes of federal "intervention" payments for "energy assistance." In conclusion, the USDA's interpretation is corroborated both by a reasonable reading of Exclusion 11's ambiguous language and its legislative history. There is no -44- 44 statutory or historical evidence whatever that Congress has evinced a "specific intention" to include HUD and FmHA URs within the Exclusion 11 language: "payment[s] . . . for energy assist- ance." Congress has never once alluded to HUD and FmHA URs as "energy assistance [payments]," even though URs preceded the enactment of Exclusion 11 by some six years. See, e.g., P.L. No. ___ ____ 93-383, 201(a), 88 Stat. 653 (1974). Chevron deference is not _______ dependent on a determination "that the agency construction was the only [permissible] one . . . , or even the reading the court ____ would have reached if the question initially had arisen in a judicial setting." Chevron, 467 U.S. at 843 n.11. _______ Notwithstanding its able effort to dispel the permeant ambiguity in the relevant legislative history, and interpret Exclusion 11 apart from its unique historical context, the court has disclosed no suggestion that Congress ever intimated its disapproval of the USDA's longstanding policy against treating routine utility reimbursements as "energy assistance [payments]." Although I recognize that "[c]ongressional inaction frequently ________ betokens unawareness, preoccupation, or paralysis," Zuber, 396 _____ U.S. at 185-86 n.21, Congress has amended Exclusion 11 not once but twice since the USDA adopted its present policy on URs. See, _____ ___ e.g., Lorillard v. Pons, 434 U.S. 575, 580 (1978) (noting: ____ _________ ____ "Congress is presumed to be aware of an administrative . . . interpretation of a statute and to adopt that interpretation when __ _____ ____ ______________ it re-enacts a statute without change") (emphasis added). Nevertheless, implicit in the approach adopted by the court is -45- 45 the impermissible presumption that on both occasions when Exclusion 11 was amended, Congress was unfamiliar with the administering agency's policy position on the very provision upon which the agency's policy depends. See Pub. L. No. 100-435, ___ 343, 102 Stat. 1647, 1663-64 (1988); S. Rep. No. 397, 100th Cong., 2d Sess. 28-29 (1988), reprinted in 1988 U.S.C.C.A.N. _________ __ 2239, 2266-67 (designating FSA amendment as a "technical correc- tion" which "is not intended to change current policy") (emphasis ___ ________ __ ______ _______ ______ added). Not only is there no statutory or historical basis for this presumption but it undermines Chevron itself, which would _______ otherwise require deference to the reasoned interpretation of Exclusion 11 adopted by the USDA as the FSA's administering agency. For the foregoing reasons, I respectfully dissent. -46- 46